**Electronically Filed
Supreme Court
SCWC-12-0000052
23-DEC-2014
09:56 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plantiff-Appellee,

vs.

JACQUES RAYMOND MONTEIL,
Petitioner/Defendant-Appellant.

SCWC-12-0000052

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000052, 3P711-1171)

December 23, 2014

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

**I. Introduction**

Defendant was convicted by the District Court for the Third Circuit (district court) of committing the offense of prostitution in violation of Hawai'i Revised Statutes (HRS) § 712-1200(1) (1993, Supp. 2013). Defendant appealed the conviction to the Intermediate Court of Appeals (ICA), arguing

there was insufficient evidence to sustain the conviction. The ICA affirmed the conviction. Defendant filed an application for writ of certiorari in which he argued the ICA erred by finding sufficient evidence to prove the commission of a prostitution offense. We affirm the judgment on appeal of the ICA, and clarify the prior-to-trial advisement required by State v. Lewis, 94 Hawai'i 292, 297, 12 P.3d 1233, 1238 (2000).

## II. Background

On August 3, 2011, James Raymond Monteil was charged by complaint in the district court with the offense of prostitution, in violation of HRS Section 712-1200(1).[1] Monteil pleaded not guilty to the charge, and trial was scheduled before the district court on January 10, 2012.

## A. Prior-to-Trial Tachibana Advisory

At the commencement of Monteil's bench trial,[2] the judge conducted the following colloquy to inform Monteil of his right to testify and the right not to testify:

> THE COURT: All right. Mr. Monteil, let me inform you:
> You have the right to remain silent and the right against

[1] HRS § 712-1200(1) states,

A person commits the offense of prostitution if the person:

(a) Engages in, or agrees or offers to engage in, sexual conduct with another person for a fee; or

(b) Pays, agrees to pay, or offers to pay a fee to another to engage in sexual conduct.

[2] The Honorable Joseph P. Florendo, Jr. presided.

2

self-incrimination. No one can force you to testify in this matter. Do you understand?

MR. MONTEIL: Yes, your Honor.

THE COURT: You don't have to present any evidence whatsoever. It's up to the State to prove this case beyond a reasonable doubt. Do you understand?

MR. MONTEIL: Yes, sir.

THE COURT: Do you understand that if you wish to testify, the Court will allow you to do so; and if you do wish to testify, your testimony will be taken under oath and subject to penalties of perjury, the prosecutor can cross-examine you, and the Court can consider your testimony in deciding if you are guilty or not guilty?

MR. MONTEIL: Yes, your Honor.

THE COURT: You can wait until after the State has completed its evidence in order to decide if you wish to testify, and you can talk to your attorney before you decide. All right?

MR. MONTEIL: Yes, your Honor.

THE COURT: All right. Call your first witness.

Notably, the court did not inform Monteil that if he did not testify, his silence could not be used against him in deciding the case.

## B. Trial

At the conclusion of the court's colloquy, the State called its first witness, Honolulu Police Department (HPD) Sergeant Chad Taniyama (Sgt. Taniyama). Sgt. Taniyama testified that his duties as a detective included organizing prostitution sting operations and that he had conducted approximately ten such operations with the HPD. Some operations involved setting up email accounts and placing advertisements in the escort section of web sites such as "Backpage" or "Craigslist."

Sgt. Taniyama testified he was the lead investigator in such an operation on July 18, 2011. He placed an advertisement in the escort section of "backpage.com" on July 16, 2011, entitled, "ExOtIC BeAuTy AwAiTs You ToDaY." The advertisement read as follows:

> Hey fellas my name is SiN.
>
> I am here for a short visit, take advantage while you can. I'm proof that amazing beauty comes in small packages. I'm 5' with race car curves and eager to make your dreams come true. Your imagination is our only limit. 100% REAL!! I guarantee you won't want to say goodbye.
>
> 420 Friendly.
>
> Send me a message at sinsplayground@gmail.com to set up an appointment.

Sgt. Taniyama testified he received email messages from several individuals in response to the advertisement, including messages from Monteil on July 16 and July 18, 2011.[3] Monteil's email conversation with Sgt. Taniyama on July 16, 2011, reads, in relevant part, as follows:

> MONTEIL: r u on big island?
>
> SGT. TANIYAMA (posing as "SiN"): Hey babe, i am not on the Big Island right now. i will b in kona on Monday. i would love to meet. lmk if we can hook up.
>
> MONTEIL: grat, what time u be i kona? lmk will like to meet u
>
> SiN: ill b in kona in the afternoon. i shold b ready 2 go by 5 or so. if you would like to book now i can pencil u in. my book fills up pretty quickly. lmk if we can meet and what kind of party u want.

_____

[3] The transcript of the email messages between Monteil and Sgt. Taniyama was admitted into evidence at trial without objection.

MONTEIL:  so then i be #1 in kona. . . where you staying? catch a drink first is better if u ok with that

SiN:  like I said hun my book fills up fast.  my first party is taken.  book now or miss the greatest ride on earth.  can have a drink at my place if u like.  ill be staying in kona town.  what kind of party ru lookin for tiger?

MONTEIL:  drink at ur place is k.  just good fun – do i really need to say on e-mail . . . . n yes what time do u have open?

SiN:  that my screening hun, making sure ur not popo. xoxoxo.

Convince me ur not popo and u can have me 6.  xoxoxo.

MONTEIL:  not a cop if that is what u r asking – the ride of my life that is . . . r u in any law enforcement group since we are been honest?

convinced enough?

SiN:  me?? popo . . . hehehe.  i have played a naughty cop many times.  jus lmk what kind of party u want babe. xoxoxoxo.

MONTEIL:  gfe experience for an hour or two

u r so freaking cute too . . .

SiN:  gfe sounds like fun!!  my part for a hour will be $300.  I cant wait to get my hands on you.  i will let u know where to cum on monday.  or send me a message. xoxoxo.

ooooooo!!!!!  flattery will get u everywhere.  o and i taste as good as i look.  xoxoxo

MONTEIL:  k . . . perfect then, I will e-mail u Monday around noon – hope u can get out of the 5 n i make ur while . . . .
i specialize in tasting competitions – until theres no more to taste.  U r gorgeous – assume photos in ur ad recent?

SiN:  o really?? i would love to put that to the test. my pics r recently done.  xoxoxoxo

MONTEIL:  u will experience it i gtd it – but better then if i meet u first at 4pm than 5 – who knows what u be doing in that hour – but then an hour might not be enough . . . I am a great massage therapist so imagine that first and then a full tasting[.]

Two days later, on July 18, 2011, Monteil and Sgt. Taniyama continued the email conversation in which they agreed to meet later that day:

> MONTEIL:  Hi there – still on at 6?  looking forward to meeting u.  where u stayin at?
>
> SiN:  yes we r sweets.  i cant wait to get my hands on u. cu at 6.  xoxoxo
>
> . . . .
> ok babe im in and ready!!  u can cum early if u like.  lmk, so I can give u the hotel.
>
> MONTEIL:  K, just like u I have to be safe so need u to answer a simple question.  Are u associated with any law enforcement? Yes or no?
>
> SiN:  No hun.  I'm not popo.  But I know how u feel.  need to b careful.  xoxoxo.  Love Sin.
>
> MONTEIL:  K, where r u at?
>
> SiN:  I'm at the kona reef, u know it? . . . Love Sin
>
> MONTEIL:  Alii drive right?
>
> SiN:   Yes hun.  Love Sin
>
> MONTEIL:  Room number
>
> SiN:  F13 . . . Love Sin

Sgt. Taniyama testified that Monteil arrived at Kona Reef Condominiums (Kona Reef) room F-13 at 6:00 p.m. on July 18, 2011.  When Monteil arrived at the room, he knocked on the door, and Officer Sharon Yoon (Officer Yoon), who was assigned by Sgt. Taniyama to dress "as a prostitute," answered, "Who is it?"  A voice replied, "It's me."  Officer Yoon opened the door and let Monteil into the unit.  Officer Yoon informed Monteil that she was "gonna get ready" and left the room.  At that juncture, "the vice officers came into the room from a separate room in the

6

unit and placed [Monteil] under arrest." Sgt. Taniyama testified he conducted a search incident to the arrest and recovered $300.00 in cash from Monteil's person.

Sgt. Taniyama testified Monteil had agreed to receive "GFE" in exchange for $300. The Officer defined the term "GFE" as "girlfriend experience" and explained that "GFE" meant unprotected sex.

> THE STATE: And what is a "GFE"?
>
> SGT. TANIYAMA: That's an internet escort term for a "girlfriend experience."
>
> THE STATE: And what does "girlfriend experience" mean?
>
> SGT. TANIYAMA: As it relates to escorts, "girlfriend experience" would mean that the john would like to be treated as if he was dealing with his girlfriend with the escort. As it relates to sexual intercourse, it would mean sexual intercourse without any contraceptives.
>
> THE STATE: And is that what the defendant requested?
>
> SGT. TANIYAMA: Yes, a GFE.
>
> . . . .
> THE STATE: And just to clarify: Going back to the term "GFE," that means "girlfriend experience." With regard specifically to sexual conduct -- I'm sorry, what -- how would you describe what a "girlfriend experience" is?
>
> . . . .
> SGT. TANIYAMA: Vaginal intercourse or anal intercourse or any intercourse without contraceptives.
>
> THE STATE: So without the use of a condom, for example?
>
> SGT. TANIYAMA: Correct.
>
> THE STATE: Okay. No further questions, your Honor.

On cross-examination, Sgt. Taniyama acknowledged the email exchange did not expressly mention sexual conduct. Sgt. Taniyama also acknowledged that from the time Monteil arrived at

the Kona Reef until the time he was arrested, Monteil did not make any indication that he came to the room to have sex.

At the conclusion of the State's case, the judge inquired if there were any witnesses for the defense. The defense counsel responded, "Yes, your Honor. We're gonna have Mr. Monteil take the stand. . . . So if you'd like to question him." The judge replied, "I think I already did that."

Monteil then took the stand and testified that in the email communications prior to his arrest, all he asked was if he could "meet somebody and have dinner or a drink," and he maintained that "GFE" had no sexual connotations that he knew of. Monteil stated as a realtor, he "use[d] 'GFE' as 'good faith estimate' all the time" and that he did not "know what the intent of 'GFE' [was] in [the] prostitute world." Monteil acknowledged his email interaction with "SiN" was not a "real estate transaction," but he asserted that when he used the term "GFE" he meant "good fun everywhere experience," "which [was] a very common term in any hotel industry." He added that "having good fun everywhere [could mean] go and have dinner and have [] drinks," and he maintained that his purpose for going to the Kona Reef was to take someone to dinner. However, on cross-examination, Monteil acknowledged he did not mention going to dinner with SiN in his emails, but rather requested a "GFE experience for an hour or two."

With respect to his email communication with "SiN" about police, Monteil stated he thought it was "very strange that [he] was being asked if [he] was popo," and he maintained he "didn't know what 'popo' was." When asked about his comment in the email correspondence about "tastings," Monteil testified he was "a food and beverage director" and the "conversation ha[d] nothing to lead to any sex or anything." Monteil additionally testified he had $400 on his person at the time of his arrest rather than the $300 the police testified to recovering from him. At the conclusion of Monteil's testimony, the defense rested.

The State's closing relied on the testimony of Sgt. Taniyama, Officer Yoon, and the cross-examination of Monteil. The defense maintained in its closing that under the prostitution statute the defendant's state of mind is at issue, not the police officer's beliefs. For that reason, the defense argued Sgt. Taniyama's testimony as to the meaning of the term "GFE" was not relevant in determining whether Monteil had the intent to engage in sexual conduct with "SiN." The defense concluded that the evidence presented failed to demonstrate Monteil had the intent to engage in sexual conduct and thus the court should find Monteil not guilty.

The district court indicated "the critical issue" was the definition of the term "GFE" or "GFE experience." The court

found "[t]aken into effect the entirety of [the email exchanges between Monteil and "SiN"], together with the actions of [Monteil], [Monteil] did agree to engage in a girlfriend experience, which, as testified by Sgt. Taniyama, would be treated as if [Monteil], or the customer, were the boyfriend of the female and had sex without contraceptives." Thus, the State "proved beyond a reasonable doubt that [Monteil] intentionally, knowingly, or recklessly paid or agreed to pay or offered to pay a fee to another to engage in sexual conduct."

When asked if he wished to make any further statements, Monteil stated, "Your Honor, . . . I am a law-abiding officer -- law-abiding citizen . . . . There was no intent whatsoever to do that."

In response to Monteil's statement, the court explained to Monteil that his testimony was an additional factor it considered in finding him guilty of prostitution:

> Part of your testimony led me to believe that you did have [] intent. You initially said you didn't have any idea what "GFE" means and you referred to your real estate experience, but the communication in this e-mail shows that you were the one who suggested the "GFE experience," . . . . but when you came onto the witness stand, you said you didn't know what "GFE" means. . . . [t]hat's one factor that I used to decide this case.

The court imposed a $500 fine and a $30 criminal injury fee.

## III. Appellate Proceedings

On appeal to the ICA, Monteil argued the district court erred by concluding there was sufficient evidence to support a conviction of prostitution based on the term "GFE." Monteil maintained that in order to establish that "[he] paid, agreed to pay, or offered to pay a fee to another to engage in sexual conduct, the district court would have to find the following, beyond a reasonable doubt": (1) "'GFE' means 'Girl Friend Experience[,]'" and (2) "the term 'Girl Friend Experience' is defined or means sexual conduct." Monteil argued there was "contradictory testimony on the definition of the term "Girl Friend Experience" and whether the term in fact means sexual conduct.

Monteil contended Hawai'i cases dealing with prostitution have held that "when a term is not statutorily defined, [courts] may resort to legal or other well accepted dictionaries as one way to determine its ordinary meaning." Monteil pointed out neither Black's Law Dictionary nor any other "generally regarded dictionaries" reference the term "GFE" or "Girl Friend Experience," and therefore, the "term 'GFE' [wa]s not commonly understood, or widely accepted to possess a generic meaning." Monteil further argued, "Hawai'i appellate courts have never recognized GFE to mean 'Girl Friend Experience'" and no

11

Hawai'i case law "defines a 'Girl Friend Experience' to mean []
sexual conduct, sexual contact or sex without contraceptives."[4]

Monteil contended Hawai'i case law requires the trial
court to find a "meeting of the minds" for an "agreement to pay
a fee to another to engage in sexual conduct" when slang terms
or phrases of uncertain meaning are used.  Monteil maintained
the "GFE" acronym was "not known or used by the general public
to the extent that it ha[d] a general recognized meaning in the
public," and therefore, the "acronym, standing by itself[,]
[was] insufficient to establish the element and *finding* of the
district court, that [he] paid, agreed to pay, or offered to pay
a fee to another to engage in sexual conduct."  Accordingly,
Monteil requested the ICA reverse his conviction.

In its Answering Brief, the State asserted it was
"well within the [district] court's discretion [to] . . . make
credibility determinations and draw reasonable inferences from
[the] evidence presented."  The State maintained that the
evidence supported the court's finding that "GFE" meant
"girlfriend experience," which constituted sexual conduct, and
that Monteil solicited a "GFE" experience from "SiN."
Therefore, the State contended that the trial court's finding
Monteil guilty of prostitution was not clearly erroneous.

---

[4]     Monteil instead argued the term "GFE" has been uniformly
recognized as "Good Faith Estimate" by federal courts located in Hawai'i.

Alternatively, the State argued that even if the district court clearly erred by finding "GFE" meant "girlfriend experience," there was "still substantial evidence Monteil agreed to pay a fee to engage in sexual conduct" as evidenced by the nature of the online advertisement and the "sexually saturated remarks" in Monteil's email exchange with Sgt. Taniyama.  The State maintained "these exchanges—and the reasonable inferences that follow given the context—[were] sufficiently credible and probative that the agreement for a GFE concerned 'sexual conduct' as that term is defined under the Hawai'i Penal Code."

The State asserted the district court "reasoned that the exhibits, [Sgt.] Taniyama's testimony, and Monteil's behavior on the stand—considered in its entirety—showed that Monteil agreed to pay a fee in return for sexual conduct."  The State concluded that the evidence presented was of "sufficient quality and probative value to sustain Monteil's conviction even if [Sgt.] Taniyama's testimony [was] disregarded."

### A. ICA Summary Disposition Order

In its Summary Disposition Order (SDO), the ICA concluded there was sufficient evidence to support the district court's finding that Monteil's use of the term "GFE" conveyed his intent to engage in sex for a fee.  The ICA noted that it was Monteil who first used the term "GFE" to describe the "kind

13

of party" he wanted in response to Sgt. Taniyama's email and who subsequently agreed to pay "for this experience." The ICA additionally noted that Sgt. Taniyama testified the term "GFE" had "a literal meaning of girlfriend experience" but "within the context of the escort industry was the equivalent of having sex as boyfriend and girlfriend without contraceptives."

The ICA noted that "even assuming that there are other meanings" for the acronym "GFE" and "the meaning testified to by Officer Taniyama has not been recognized by the courts of Hawai'i as Monteil argues, Officer Taniyama testified GFE is understood as referring to unprotected sex in the escort context, and when Monteil used the term in that context, it was to convey that meaning." The ICA further noted that the "District Court credited Officer Taniyama's testimony."

The ICA found the context of the email exchange supported Sgt. Taniyama's testimony. The ICA held "[i]t [was] well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence" within "the province of the trier of fact." The ICA concluded that in considering the evidence in the strongest light for the prosecution, there was substantial evidence as to every material element of the offense charged. Thus, the ICA affirmed the district court's judgment of conviction.

### B. Application for Writ of Certiorari

In his Application for Writ of Certiorari (Application) to this court, Monteil raises the following point of error:

> The ICA committed grave error when it found the State introduced sufficient evidence to find Monteil guilty under the new prostitution statute, because he never agreed or offered to pay another for sexual conduct.

Monteil reiterates his argument that there was insufficient evidence demonstrating he offered to pay another for sexual conduct and that the trial court's determination of the meaning of "GFE" was improper.

Additionally, Monteil argues that, assuming he meant "girlfriend experience" in his email, Sgt. Taniyama's definition "as it relates to escorts" was "consistent with an offer to pay for . . . lawful services provided by escorts, including dates, dancing, dinner, drinks, . . . or flirting in an email exchange, all of which fall outside the definition of sexual conduct." Monteil argues that the ICA's conclusion that there was sufficient evidence to convict him of prostitution was "clearly wrong" and that "girlfriend experience," as it relates to services performed by an escort, does not involve sexual contact or sexual intercourse.

Monteil asks this court to reverse the ICA's SDO and the district court's judgment of conviction and remand this case for entry of an acquittal.

In its Response to Monteil's Application (Response), the State contends Monteil made "many sexually saturated remarks" throughout his email exchange with "SiN," which evidences that "he wanted to engage in sexual conduct." The State concludes that these remarks, "and the reasonable inferences that follow, given Monteil's subsequent actions, are sufficiently credible and probative that the $300 agreement for a 'gfe experience' was vernacular for sexual conduct."

In Monteil's Reply, he argues that "75% of the 'sexually saturated remarks' in the email exchange were made by Sgt. Taniyama, and exchanges about 'popo' and 'tasting' were initiated by SiN, not Monteil." Monteil argues the "prohibited conduct must be shown by *the defendant's words*, not police suggestions," and he contends that he did not "email SiN [in response to the ad] requesting sexual favors."

### IV. STANDARD OF REVIEW

On appeal, the test for sufficiency of the evidence is "not whether guilt is established beyond a reasonable doubt, but whether there is 'substantial evidence' to support the conclusion of the trier of fact." State v. Matavale, 115 Hawai'i 149, 157-58, 166 P.3d 322, 330-31 (2007) (quoting State v. Batson, 73 Haw. 236, 248-49, 831 P.2d 924, 931 (1992)). "Substantial evidence" is "credible evidence which is of sufficient quality and probative value to enable a person of

16

reasonable caution to support a conclusion."  Id. at 158, 166 P.3d at 331 (quoting Batson, 73 Haw. at 248-49, 831 P.2d at 931).  When considering the legal sufficiency of evidence to support a conviction, such "evidence adduced in the trial court must be considered in the strongest light for the prosecution." Matavale, 115 Hawai'i at 157, 166 P.3d at 330.

In a bench trial, "the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence."  Batson, 73 Haw. at 249, 831 P.2d at 931.  Further, "[i]t is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of facts; the judge may accept or reject any witness's testimony in whole or in part."  State v. Eastman, 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996).  It is not the role of the appellate court to weigh credibility or resolve conflicting evidence.  Id.; State v. Wallace, 80 Hawai'i 382, 418, 910 P.2d 695, 731 (1996).

## V. DISCUSSION

### A. Sufficiency of the Evidence

A person commits the offense of prostitution if he or she "[p]ays, agrees to pay, or offers to pay a fee to another to engage in sexual conduct."  HRS § 712-1200(1)(b).  In this case, the State adduced evidence that Monteil responded to Sgt. Taniyama's online advertisement in which the officer portrayed

17

an escort named "SiN."  The email conversations between Monteil and "SiN" were replete with sexual innuendo,[5] and at several times during the conversation, Monteil expressed concern about whether "SiN" was involved in law enforcement.[6]  Ultimately, Monteil asked "SiN" for a "GFE experience for an hour or two" and offered to pay $300.00 for such experience.  After reaching an agreement with "SiN" to pay $300.00 for "GFE," Monteil arranged a date, time and location to meet "SiN," and he followed through with those plans.

Sgt. Taniyama and Monteil both testified as to the meaning of "GFE."  Sgt. Taniyama explained the term "GFE" was vernacular in the internet escort community for "girlfriend experience," which in turn meant to have sex with another without the use of contraceptives.  Monteil testified he did not know what "GFE" meant in the context of prostitution; he asserted that "GFE" means "good faith estimate" in the real

[5]     For example, "SiN" made several sexually suggestive comments to Monteil: 1) he needs to "book [her] now or miss the greatest ride on earth," 2) she "played a naughty cop many times," 3) she "can't wait to get [her] hands on [him]," and 4) she "will let [Monteil] know where to cum." Additionally, in response to "SiN's" comment that she "taste[d] as good as she look[ed]" in her ad, Monteil told "SiN" that 1) he specialized in "tasting competitions," 2) he would taste her "until there's no more to taste," and 3) he guaranteed that she would "experience" the "tasting."

[6]     When "SiN" initially asked what "kind of party" he wanted, Monteil was resistant to answering on email, "Do i really need to say on e-mail . . . ."  Monteil then asked whether or not "SiN" was in any "law enforcement group."  On the day that Monteil was scheduled to meet with "SiN," Monteil again asked "SiN" if she was "associated with any law enforcement."

estate context and that "GFEE" means "good fun everywhere experience" in the hotel industry.

In its oral ruling, the district court expressly relied on Sgt. Taniyama's testimony in finding "GFE" constituted sexual conduct; by contrast, the judge noted Monteil's testimony regarding the term "GFE" was inconsistent and contradictory. The sexual nature of the email conversation between Monteil and "SiN" further supports Sgt. Taniyama's contention that "GFE" constitutes sexual conduct.

When viewed in the light most favorable to the State, the totality of the evidence—including the email conversation, Sgt. Taniyama's testimony,[7] and Monteil's subsequent actions—constitutes substantial evidence that Monteil contacted "SiN" to solicit sexual conduct. Thus, the ICA did not err in concluding the evidence adduced at trial was sufficient to sustain Monteil's conviction for prostitution.

---

[7] The ICA has previously relied on police testimony to discern the meaning of colloquial words, phrases, or other types of street vernacular. State v. Connally, 79 Hawai'i 123, 127, 899 P.2d 406, 410 (App. 1995) (affirming the defendant's conviction for prostitution based, in part, on the officer's testimony that the defendant's question in Japanese to the Japanese male tourists, "Would you like to play?" was the street vernacular equivalent to "Would you like to have sex?").

## B. Prior-to-Trial Advisement

### 1.

Hawai'i law has long recognized that a defendant accused of a criminal offense is accorded specific fundamental rights, including the right to be represented by counsel, the right to have guilt proved beyond a reasonable doubt, and, as relevant to this case, the right to testify and the right not to testify.  See Tachibana v. State, 79 Hawai'i 226, 900 P.2d 1293 (1995); see also Lewis, 94 Hawai'i at 295, 12 P.3d at 1236.

A defendant's "right to testify is guaranteed by the United States' Sixth Amendment guarantee of compulsory process, and Fourteenth Amendment guarantee of due process; the Hawai'i Constitution's parallel guarantees under Article I, sections 14, and 5, respectively; and HRS § 801-2 (1993)'s statutory protection of the right to testify, which states, 'In the trial of any person on the charge of any offense, he shall have a right . . . to be heard in his defense.'"  State v. Pomroy, 132 Hawai'i 85, 91, 319 P.3d 1093, 1099 (2014) (citing Tachibana, 79 Hawai'i at 231-32, 900 P.2d at 1298-99); accord State v. Han, 130 Hawai'i 83, 87, 306 P.3d 128, 132 (2013).

A defendant's right not to testify is guaranteed by the United States' Fifth Amendment guarantee against compelled testimony and the Hawai'i Constitution's parallel guarantee under

Article I, section 10.  See State v. Silva, 78 Hawai'i 115, 124, 890 P.2d 702, 711 (App. 1995), abrogated on other grounds by Tachibana, 79 Hawai'i 226, 900 P.2d 1293; see also Lewis, 94 Hawai'i at 293, 12 P.3d at 1234.  As early as 1887, this court held that a defendant should not be prejudiced for exercising the right not to testify and for remaining silent at trial.  See The King v. McGiffin, 7 Haw. 104, 114 (Haw. Kingdom 1887) (holding a comment by the prosecution in its summation as to the defendant's failure to testify was "highly improper, and contrary to the statute" although not prejudicial in the particular case as the court intervened and directed the jury not to take notice).  The Hawai'i Legislature later adopted and codified this common law rule when it enacted HRS § 621-15 that provided, in part, "[N]o inference shall be drawn prejudicial to the accused by reason of such neglect or refusal [to testify], nor shall any argument be permitted tending to injure the defense of the accused person on account of such failure to offer himself as a witness."  HRS § 621-15 (1976) (repealed 1980).  This provision has evolved over the years and is found today in Hawai'i Rules of Evidence (HRE) Rule 513, which prohibits the court or counsel to comment on, or draw any inference from, a defendant's exercise of the right not to testify.  HRE Rule 513(a) (codified at HRS § 626-1).

21

Thus, Hawai'i has historically protected both the right to testify and the right not to testify. To ensure that a decision to waive the fundamental right to testify is an intelligent and voluntary act, this court adopted the colloquy approach in which "the trial judge, as a matter of routine, conducts an [on-the-record] inquiry . . . with the defendant." Tachibana, 79 Hawai'i at 233, 900 P.2d at 1300.

In Tachibana, this court reviewed a defendant's claim that his attorney had prevented him from testifying at trial, and thus violated his right to testify. 79 Hawai'i at 230, 900 P.2d at 1297. To protect the right to testify and to limit similar post-conviction challenges, Tachibana required that the trial court conduct an "ultimate colloquy" in cases in which a defendant has not testified prior to the close of the case. 79 Hawai'i at 236, 900 P.2d at 1303. The court is required to advise defendants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify. Id.

"In conducting the colloquy, the trial court must be careful not to influence the defendant's decision whether or not to testify." Tachibana, 79 Hawai'i at 236 n.7, 900 P.2d at 1303 n.7. Accordingly, the court's advisory to the defendant must maintain an "even balance" between a defendant's right to

22

testify and the right not to testify. Lewis, 94 Hawai'i at 295, 12 P.3d at 1236. Particular caution must be afforded to avoid infringing upon the right not to testify, which has been recognized as a "more fragile right"[8] than the right to testify. See id. at 295, 12 P.3d at 1236.

Expressly recognizing the importance of a balanced advisement, Tachibana provides the trial courts with specific guidance for the "ultimate" colloquy to ensure defendants are informed of their right to testify and not to testify, without influencing this decision. As stated by Tachibana, the court should inform the defendant of the following:

> [H]e or she has a right to testify, that if he or she wants to testify that no one can prevent him or her from doing so, and that if he or she testifies the prosecution will be allowed to cross-examine him or her. In connection with the privilege against self-incrimination, the defendant should also be advised that he or she has a right not to testify and that if he or she does not testify then the jury can be instructed about that right.

Tachibana, 79 Hawai'i at 236 n.7, 900 P.2d at 1303 n.7

---

[8] "Fragile" in the context of the right not to testify derives from Siciliano v. Vose, 834 F.2d 29 (1st Cir. 1987).

> To require the trial court to follow a special procedure, explicitly telling defendant about, and securing an explicit waiver of, a privilege to testify (whether administered within or outside the jury's hearing), could inappropriately influence the defendant to waive his constitutional right not to testify, thus threatening the exercise of this other, converse, constitutionally explicit, and more fragile right.

Id. at 30. The court in Siciliano suggests that advising the defendant of the right to testify may inappropriately influence the defendant to relinquish the more fragile constitutional right not to testify.

(emphasis added).

In addition to requiring an "ultimate colloquy," Tachibana strongly recommended trial courts conduct a prior-to-trial advisement to inform defendants of their right to testify and the right not to testify. Id. at 237 n.9, 900 P.2d at 1304 n.9 (noting that "although the ultimate colloquy should be conducted after all evidence other than the defendant's testimony has been received, it would behoove the trial court, prior to the start of trial" to inform the defendant of his or her right to testify or not to testify). However, not all trial courts took heed of Tachibana's recommendation.

In Lewis, the court reviewed a post-conviction challenge from a defendant who testified at his trial and was subsequently found guilty. Lewis, 94 Hawai'i 292, 12 P.3d 1233. The defendant did not receive either the "ultimate" Tachibana colloquy or Tachibana's recommended prior-to-trial advisement. Id. On appeal, the defendant argued the trial court erred by failing to obtain an on-the-record waiver of his right not to testify. Id.

In finding the trial court did not err, the Lewis court observed Tachibana's "ultimate" colloquy was primarily intended to protect the right to testify and thus was "only required in cases in which the defendant does not testify." Id.

24

at 295, 12 P.3d at 1236 (internal quotation marks omitted). Lewis further noted the prior-to-trial advisement discussed in Tachibana was a recommendation, not a requirement for trial courts. Id. at 296-97, 12 P.3d at 1237-38. As such, Lewis held the trial court in that case was not required to advise the defendant of his right not to testify. Id.

Although holding the trial court did not err,[9] Lewis found that there was a "salutary effect" gained from "a trial court addressing a defendant" prior to trial regarding the right to testify or not testify. Id. Specifically, the court noted a prior-to-trial advisement would "have the beneficial impact of limiting any post-conviction claim that a defendant testified in ignorance of his or her right not to testify." Id. The pretrial advisement also lessened the risk that the "ultimate colloquy" would affect the defendant's right not to testify. Tachibana, 79 Hawai'i at 236 at 236 n.9, 900 P.2d at 1303 n.9 ("Such an early warning would reduce the possibility that the trial court's colloquy could have any inadvertent effect on [] the defendant's right not to testify . . . ."). Lewis thus recognized the fundamental importance of a trial court informing

---

[9] The Lewis court concluded that although the trial court did not advise the defendant of his right not to testify, there was "nothing to indicate [] [the defendant's] decision to testify was anything other than voluntarily, knowingly, and intelligently made," and the court affirmed the conviction. Lewis, 94 Hawai'i at 296-97, 12 P.3d at 1237-38.

25

a defendant of the constitutional right not to testify prior to the commencement of trial.

Accordingly, Lewis set forth a prospective requirement that, prior to the start of trial, trial courts must "(1) inform the defendant of his or her personal right to testify or not to testify and (2) alert the defendant that if he or she has not testified by the end of the trial, the court will briefly question the defendant to ensure that the decision not to testify is the defendant's own decision." 94 Hawai'i at 297, 12 P.3d at 1238 (quoting Tachibana, 79 Haw. at 237 n.9, 900 P.2d at 1304 n.9). In contrast to Tachibana's delineated advisory for the "ultimate" colloquy, Lewis did not specify the content of the prior-to-trial advisement.

**2.**

In this case, at the commencement of trial, the court conducted a prior-to-trial advisement to inform Monteil of his right to testify and right not to testify. As to Monteil's right not to testify, the court advised him that he had the "right to remain silent and the right against self-incrimination" and that no one could "force [him] to testify." The court also informed Monteil that he did not "have to present any evidence whatsoever" and that it was "up to the State to prove [the] case beyond a reasonable doubt." However, the court's prior-to-trial advisement did not inform Monteil that if

26

he exercised his right not to testify, his silence could not be used against him in deciding the case.  Monteil later testified without a further advisory from the court.

**3.**

A defendant's understanding of the right to testify or not to testify is fundamental to a fair trial.  A court has a "serious and weighty responsibility to determine whether" a waiver of the right to testify is a knowing and intelligent decision.  Tachibana, 79 Hawai'i at 233, 900 P.2d at 1300.  Similarly, a decision by a defendant not to testify should be based upon a defendant's awareness of the "relevant circumstances and likely consequences" of such a decision.  See Brady v. United States, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.").

Foremost among the "relevant circumstances" pertaining to the constitutional right not to testify is the guarantee that a defendant cannot be penalized for exercising the right not to testify.  That is, "no inference may be drawn therefrom," by the fact finder.  HRE Rule 513(a).  If an inference of guilt could be drawn from not testifying, such penalty would erode the constitutional guarantee against compelled testimony as it would tend to coerce a defendant to testify.

27

In this case, the court did not advise Monteil of the very significant "relevant circumstance" of his right not to testify—i.e., that no inference of guilt may be drawn for exercising this right. Because Monteil testified, implicitly waiving his right not to testify prior to the close of his defense's case, he did not receive the "ultimate" Tachibana colloquy. However, had Monteil waited until he received the "ultimate" colloquy before deciding whether to testify, he would have been informed by the court that a decision not to testify could not be used against him in deciding the case.[10]

This imbalance in information between the prior-to-trial advisement and the "ultimate" colloquy potentially threatens the "more fragile right" not to testify, as testifying defendants, such as Monteil, are not assured to receive adequate advisement of the "relevant circumstance" of exercising the

---

[10] The Tachibana ultimate colloquy provides as follows in relevant part:

> In connection with the privilege against self-incrimination, the defendant should also be advised that he or she has a right not to testify and that if he or she does not testify then the jury can be instructed about that right.

Tachibana, 79 Hawai'i at 236 at 236 n.7, 900 P.2d at 1303 n.7. Hawai'i Criminal Jury Instruction No. 3.14, entitled "Defendant Not Required to Testify" provides as follows:

> The defendant has no duty or obligation to testify, and you must not draw any inference unfavorable to the defendant because he/she did not testify in this case, or consider this in any way in your deliberations.

right not to testify.  Consequently, a prior-to-trial advisement that fails to advise the defendant that a decision not to testify may not be used as evidence of guilt, may jeopardize an informed decision by the defendant regarding whether to testify.

The prior-to-trial advisement as given in this case additionally may not achieve its intended objective of limiting post-conviction challenges from defendants claiming to have testified without adequate awareness of the right not to testify.  Lewis, 94 Hawai'i at 297, 12 P.3d at 1238 (pretrial advisement "will have the beneficial effect of limiting any post-conviction claim that a defendant testified in ignorance of his or her right not to testify").[11]  If a court omits a significant "relevant circumstance" of the right not to testify from its prior-to-trial advisement, as occurred in this case, the advisement's effect on limiting post-conviction challenges is diminished.  See Lewis, 94 Hawai'i at 297, 12 P.3d at 1238.

Further, a pretrial advisement that fails to adequately inform a defendant of a "relevant circumstance" poses a possibility that the court may inadvertently influence a defendant's decision of whether or not to testify.  See Lewis,

---

[11]    See also Tachibana, 79 Hawai'i at 235, 900 P.2d at 1302 ("[B]y engaging in the colloquy, a trial judge would establish a record that would effectively settle the right-to-testify issues in the case, and thereby relieve the trial judge of extended post-conviction proceedings." (quoting Boyd v. United States, 586 A.2d 670, 679-80 (D.C. App. 1991)).

94 Hawai'i at 295, 12 P.3d at 1236; Tachibana, 79 Hawai'i at 236 n.7, 900 P.2d at 1303 n.7.  In expressly recognizing the risk of undue influence, Tachibana provided trial courts with express guidance to ensure the "ultimate" colloquy would "maintain the even balance of the trial court's statement to the defendant" while at the same time providing sufficient information for a defendant to be adequately informed of his or her right to testify or not to testify.  Lewis, 94 Hawai'i at 295, 12 P.3d at 1236 (balanced statement was intended to avoid risk that "by advising the defendant of his or her right to testify, the court could influence the defendant to waive his or her right not to testify").

In this case Monteil was informed of the right to remain silent, the right against self-incrimination, and that no one could force him to testify, however not conveyed was the critical information that the exercise of the right not to testify does not permit a fact finder to draw an inference of guilt from not testifying.  Consequently, such an advisory may have a potential to influence the decision to testify or not testify.

To address the future risk of a court inadvertently influencing a defendant's decision, the court's pretrial advisement should provide the "even balanced" statement that is required in the ultimate colloquy—that a decision not to testify

30

may not be used against the defendant in deciding the case. This will ensure that the testifying defendant is provided with the same information that is given to the non-testifying defendant regarding the "circumstance" of not testifying, and thus, the court will avoid emphasizing one right over the other. It will also help accomplish one of the primary objectives of the pretrial advisory, which is to reduce the number of post-conviction challenges from defendants claiming to have testified in ignorance of their right not to testify. Lewis, 94 Hawai'i at 297, 12 P.3d at 1238.

Therefore, we hold that in order to more fully protect the right not to testify under the Hawai'i Constitution, the trial courts when informing the defendant of the right not to testify during the pretrial advisement must also advise the defendant that the exercise of this right may not be used by the fact finder to decide the case. This requirement will be effective in trials beginning after the date of this opinion. The inclusion of this information in the pretrial advisement will enhance the even balance of the trial court's statement to defendants regarding the right to testify or the right not to testify. See Lewis, 94 Hawai'i at 295, 12 P.3d at 1236.

**4.**

Although the court's advisement did not inform Monteil that his silence could not be used against him if he did not testify, "there is nothing to indicate his decision to testify was anything other than voluntarily, knowingly, and intelligently made." Lewis, 94 Hawai'i at 296-97, 12 P.3d at 1237-38. "Thus, there can be no [finding of] error premised on [the] lack of judicial advice" in this case.[12] Id. at 296, 12 P.3d at 1237.

## VI. Conclusion

Accordingly, we affirm the March 3, 2014 Judgment on Appeal of the ICA, but for the reasons set forth in this opinion.

| | |
|---|---|
| Peter Van Name Esser and Robert D.S. Kim for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Mitchell D. Roth and Jason R. Kwiat for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



---

[12] As stated in Lewis, "Because we view this prior-to-trial advisement as incidental to the 'ultimate colloquy,' any claim of prejudice resulting from the failure of the trial court to give it must meet the same 'actual[ ] prejudice[]' standard applied to violations of the colloquy requirement." 94 Hawai'i at 297, 12 P.3d at 1238 (alterations in original) (quoting Tachibana, 79 Hawai'i at 237, 900 P.2d at 1304).