**Electronically Filed
Supreme Court
SCWC-13-0000203
08-JUN-2015
09:19 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

EVANS NATHAN GUYTON,
Petitioner/Defendant-Appellant.

SCWC-13-0000203

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0000203; CASE NO. 2DCW-12-0000362)

June 8, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

This case presents the question of whether the phrase "residence, including yard and garage" in an injunction order encompasses the outer area of the protected person's 1,000-acre property, far removed from the vicinity of the person's home. We hold that it does not.

## I.    BACKGROUND

### A.    The Injunction Order and the Alleged Violation

John Varel owns, and lives with his wife on a one-thousand-acre property in Waiheʻe, Maui County.  On September 14, 2009, the District Court of the Second Circuit (district court)[1] granted a petition for injunction against harassment (Injunction Order) filed by Varel, pursuant to Hawaiʻi Revised Statutes (HRS) § 604-10.5(b) (Supp. 1999).  The Injunction Order was directed against Evans Guyton, and it was effective for three years from the issuance date.  The Injunction Order stated as follows:

> **IT IS ORDERED, ADJUDGED AND DECREED THAT:**
> 1.    The Petition is granted.
> 2.    The Ex Parte Temporary Restraining Order herein is made absolute as of July 21, 2009
> 3.    The Respondent(s) and any othr (sic) person acting on behalf of the Respondent(s) is hereby restrained and enjoined from:
>        a.    ☑ Contacting, threating [sic], or physically harassing the Petitioner(s) and any person(s) residing at Petitioner(s)' residence
>        b.    ☑ Telephoning the Petitioner(s)
>        c.    ☑ Entering or visiting the Petitioner(s)' residence, including yard and garage and
>               ☑ place of employment.
> 4.    Said injunction shall be effective as of 9/14/2009 and shall be in full force and effect for a period of month(s) 3 year(s) from said date unless terminated or modified by appropriate orders by this Court.

(Emphasis added)[2]

---

[1]    The Honorable Simone C. Polak presided.

[2]    The Injunction Order is a preprinted form completed by the district court.

Todd Arnold (Arnold), a private contractor farmer for Varel, also resides on Varel's property. On February 19, 2012, at around 10:30 a.m., Arnold was hiking with his family on the ridges located on Varel's property. As they reached the area toward the top of the ridges, Arnold observed Guyton dirt biking in the company of other riders.

As a result of this incident, the State filed a complaint charging Guyton, pursuant to HRS § 604-10.5(h),[3] with the offense of violation of a restraining order or injunction. Specifically, the complaint charged Guyton with "entering and/or visiting the premises including yard and garage of the residence, and/or place of employment" of Varel on February 19, 2012.[4]

---

[3] HRS § 604-10.5(h) states in relevant part as follows:

A knowing or intentional violation of a restraining order or injunction issued pursuant to this section is a misdemeanor.

[4] The Complaint stated as follows:

That on or about the 19th day of February, 2012, in the Division of Wailuku, County of Maui, State of Hawaii, EVANS NATHAN GUYTON did intentionally or knowingly violate a restraining order or injunction, to wit, an Order Granting Petition for Injunction Against Harassment, issued in DC-TRO 09-1-0199, on September 14, 2009, by entering and/or visiting the premises including yard and garage of the residence, and/or place of employment of the other, thereby committing the offense of Violation of Restraining Order or Injunction in violation of Section 605-10.5 of Hawaii Revised Statutes.

It should be noted that the charge in the complaint differs from the language stated in the Injunction Order, in that the word

(continued. . .)

## B.     Bench Trial

A bench trial commenced on February 22, 2013.  Varel described his 1,000-acre property as consisting of a commercial macadamia nut farm, conservation land, and his residence.  In describing the expanse of his property, Varel testified that it "runs about a mile and a quarter parallel to the highway and then a mile and a quarter back all the way up to the watershed." According to Varel, his "residence is off to the right end" of the 1,000-acre parcel.

Varel testified that he did not give permission to anyone to use any portion of his property for dirt biking, that he and his wife had been living on the property, and that he sought and was awarded an injunction against Guyton in 2009.  On the day of the incident, he was on the mainland for a business trip.

Arnold testified that he was working as a private contractor farmer for Varel and that he was residing on Varel's property.  At around 10:30 a.m. on February 19, 2012, after three to four hours of hiking around the property, he came upon Guyton as he and his family reached the "ridge area of the property"--the "top ridges, not all the way, but up on the

(. . .continued)
"premises" appears only in the complaint and not in the Injunction Order.

mountain side"--located on the outer limits of Varel's property. According to Arnold, he recognized and was familiar with Guyton because Guyton is generally known in the dirt biking community, he had seen Guyton around town riding his truck and in areas where Guyton rides his bike, and because of an earlier encounter.

On the day in question, Arnold indicated that one of the riders approached and told him that they had permission to ride on that portion of Varel's property. Arnold controverted this claim, testifying that nobody ever had permission to ride dirt bikes on Varel's property. Arnold acknowledged that in the vicinity of the area in which he observed the riders, there were no "no trespassing" signs, since such signs are located only on the front entrance of the property.

When asked how he was certain that the riders and Guyton were on Varel's property, Arnold answered, "Just being out there as long as I had, I know where the ridge lines are. . . . I know where [Varel] has pointed out to me." Additionally, Arnold also stated that he had seen the map of Varel's property and walked its boundary lines.

Varel was recalled by the State, at which point he testified that the area where Arnold observed Guyton is about half a mile into his property from the boundary line between his property and the neighboring property. Varel also stated that

during the injunction hearing, Guyton was shown a blown-up map of his property indicating its perimeters, the area that it covered, and neighboring properties. According to Varel, the map indicated that the ridge where Arnold saw Guyton is part of his property. Varel also confirmed that there were no "no trespassing" signs in the area in which Guyton was seen.

The defense called Ryan Stewart as a witness. Stewart testified that he had known and been acquainted with Guyton through the motocross community and because they had previously ridden dirt bikes together. According to Stewart, while he was watching a motocross race on February 19, 2012, he observed Guyton at the racetrack from between 8:00 a.m. to 10:00 a.m. until about 3:00 p.m. or 4:00 p.m. Stewart indicated that he did not see Guyton leave the racetrack, but he acknowledged that he saw Guyton only intermittently--about three to six times-- that day.

Guyton testified that he was a construction worker and lived on Maui for approximately thirty years before retiring about ten years earlier. Guyton stated that, on February 19, 2012, he watched a motocross race at a location about five or six miles from Varel's property. Guyton stated that he was at the race from around 8:30 a.m. until approximately 4:00 p.m. and then left to do some shopping. He denied ever going to Varel's

property and testified that he had never "seen [Arnold] in [his] entire life."

Guyton recognized a copy of the Injunction Order. He indicated that he was shown a map of Varel's property during the 2009 injunction hearing, but he stated that the map did not specify the boundary lines of Varel's property and that, in any event, he was unable to comprehend it. Guyton stated that he was not given a copy of the map that was presented during the injunction hearing. He further testifed that he was familiar with the portions of Varel's property that are not enclosed by a fence, the area of which constitutes about 75% of Varel's property. According to Guyton, the limited fencing around Varel's property is located "over where [Varel] lives," with the rest of the property having "no fence at all," no "[n]o trespassing signs, no posted nothing." Guyton stated that Varel's property was previously owned by "Wailuku Ag" and was a recreation area in which dirt biking was allowed. Guyton acknowledged that he "know[s] now that it's . . . Varel['s property], and it's off limits  . . . from the [injunction hearing] three years ago. [He] know[s] that it's his land, not to go on it."

In its closing argument, the State viewed the fact that Guyton was shown a blown-up zoning map of Varel's property during the 2009 injunction hearing as constituting adequate

notice of the area in which he was prohibited from entering. The State also emphasized Guyton's admission of his knowledge that he was not allowed to go on Varel's property.

During his closing argument, defense counsel contended that Guyton was not aware that he entered Varel's property primarily because there were no "no trespassing" signs or fences in the vicinity of the area in which he was allegedly seen by Arnold. Further, defense counsel disputed the State's claim that the map shown to Guyton during the injunction hearing was sufficient to inform Guyton of exactly where he was prohibited from being present, arguing that the immensity of Varel's property made it impossible for Guyton to keep track of all of the property's boundary lines. In addition, defense counsel argued that the Injunction Order did not clearly outline the location of the property's boundary lines, making it impossible for Guyton to have had the necessary mental state required by the offense with which he was charged. Defense counsel also maintained that the entire 1,000 acres of Varel's property should not be considered as constituting the "yard" of Guyton's residence.

After the closing arguments, the district court stated that it was having an issue with the term "yard" as used in the Injunction Order, so the State provided a dictionary definition of "yard" as "the grounds of a building or group of buildings;

the grounds immediately surrounding a house; an area with its buildings and facilities set aside for a particular business or activity; an assembly or storage area as for drydocked boats."[5] The State also responded to defense counsel's arguments, urging the district court to hold that the entire 1,000-acre land surrounding Varel's house "is his yard. The fact that his yard is bigger and some people have a small yard, there's nothing prohibiting that."

### C. Judgment

At the conclusion of the trial, the district court found that Guyton violated the Injunction Order and imposed a fine of $500, which was stayed pending the outcome of Guyton's appeal. Judgment was entered on February 22, 2013. Thereafter, the district court issued its Findings of Fact and Conclusions of Law (FFCL) on April 1, 2013.[6] In relevant part, paragraphs 3 and 4 of the FFCL indicated that the district court found Arnold and Varel to be credible witnesses.[7] In paragraphs 5 and 6, the

---

[5] The State did not specify the dictionary from which it obtained this definition. In his Opening Brief to the ICA, Guyton identifies the Merriam-Webster Dictionary as the source of the State's definition, which the State confirmed in its Answering Brief.

[6] The district court did not clearly differentiate in the FFCL its findings of fact from its conclusions of law, both of which were aggregated under one heading.

[7] Paragraph 3 referred to a "John Barel," not Varel. However, based on the Injunction Order and trial transcript, this appears to be a typographical error.

district court found Guyton and Stewart not to be credible witnesses. In addition, the district court concluded, in paragraph 7 of the FFCL, that "[t]he language of the [Injunction Order] is sufficiently broad to include in its prohibition[] the place of the property where" Arnold saw Guyton.

## II. APPELLATE PROCEEDINGS

On March 19, 2013, Guyton filed a Notice of Appeal from the Judgment. In his Opening Brief, Guyton contended that the district court erred in adjudging him guilty of intentionally or knowingly entering or visiting Varel's "residence, including yard and garage." Specifically, Guyton argued that the most reasonable construction of the term "yard," as used in the Injunction Order, should not encompass the entire 1,000 acres of Varel's property. Guyton contended that, because "yard" is clear and unambiguous and was not defined by the Injunction Order or statute, its plain, generally accepted meaning must control and such meaning does not contemplate the farm and conservation land within Varel's property.

Additionally, relying on the rule of lenity, Guyton argued that any ambiguity that the ICA might find in the term "yard" must be resolved in the light most favorable to him. Recognizing that the canons of statutory interpretation upon which he relied do not directly apply to the Injunction Order because it is not a statute, Guyton asserted that these canons

are equally applicable because "the injunction assumed the role of a statute by having the same function as law."

Guyton also argued that the State failed to prove that he acted with the requisite state of mind, that he knowingly or intentionally visited or entered Varel's property, since the precise location of its boundary lines was not known to him with certainty.[8]

In its Answering Brief, the State responded that there was sufficient evidence at trial to support Guyton's conviction. The State argued that Guyton's actual understanding of the acts prohibited by the Injunction Order--as could be gleaned from his testimony at trial that he was aware that Varel's property was off limits to him--undermined his claim that he should not be expected to understand the term "yard." The State also asserted that even though the dictionary definition of "yard" that the State provided at trial was incomplete, the district court properly relied on it. Finally, the State contended that Guyton acted with the requisite mental state based on his testimony that he was very familiar with Varel's property coupled with the fact that a map of Varel's property was shown to Guyton during the 2009 injunction hearing.

---

[8] Guyton, however, conceded that his conduct might have been reckless, a state of mind that falls short of what is required by the offense with which he was charged. See HRS § 605-20.6(h).

On Febuary 5, 2015, the Intermediate Court of Appeals (ICA) issued its Summary Disposition Order (SDO), which affirmed the Judgment.  The ICA majority held that Guyton's conviction was based on sufficient evidence, reasoning that the seventh paragraph[9] of the district court's FFCL

> is not wrong because (1) the District Court convicted Guyton based on his conduct of entering or visiting . . . Varel's . . . 'residence'; and (2) there is substantial evidence showing Guyton (a) knew that 'residence,' as used in the injunction, encompassed Varel's entire property . . . and (b) knowingly entered or visited Varel's property.

The Honorable Katherine G. Leonard, in her dissent, concluded that "the State failed to establish that the area where Guyton was observed "was part of 'the premises including yard and garage of the residence, and/or place of employment of [John Varel].'"

In his Application for Writ of Certiorari, Guyton reasserts the arguments that he made before the ICA.

### III. STANDARDS OF REVIEW

The interpretation or construction of a judgment, decree, or order "presents a question of law for the courts." Cain v. Cain, 59 Haw. 32, 39, 575 P.2d 468, 474 (1978). Questions of law are reviewed under the right/wrong standard of

---

[9]     The seventh paragraph of the FFCL provides, "The language of the [2009 Injunction] Order . . . is sufficiently broad to include in its prohibition, the place on the property where the witness testified that he saw Defendant on the day of the offense."

review.  State v. Higa, 79 Hawai'i 1, 3, 897 P.2d 928, 930 (1995).

The standard of review in determining the sufficiency of the evidence is "not whether guilt is established beyond a reasonable doubt, but whether there is substantial evidence to support the conclusion of the trier of fact."  State v. Matavale, 115 Hawai'i 149, 157—58, 166 P.3d 322, 330–31 (2007); accord State v. Monteil, 134 Hawai'i 361, 368, 341 P.3d 567, 574 (2014).  Substantial evidence as to every material element of the charged offense means "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."  Monteil, 134 Hawai'i at 368, 341 P.3d at 574 (quoting Matavale, 115 Hawai'i at 158, 166 P.3d at 331) (internal quotation marks omitted).

## IV.  DISCUSSION

### A.  Overarching Principles

The Injunction Order in this case prohibited Guyton from "[e]ntering or visiting [Varel's] residence, including yard and garage."  The words "residence" and "yard" are not defined in the Injunction Order.  The primary issue is the meaning of the phrase "residence, including yard" and whether it encompasses the area in which Arnold observed Guyton.

In LeMay v. Leander, 92 Hawai'i 614, 994 P.2d 546, (2000), this court held that to hold a party in civil contempt,

"there must be a court decree that sets forth in specific detail an unequivocal command that the contemnor violated." 92 Hawai'i at 625, 994 P.2d at 557. While LeMay involved a civil contempt violation, its requirement of particularity and clarity in the language of an order applies with at least the same force to injunction orders prohibiting harassment, especially since the violation of such an injunction order exposes the defendant to a one-year jail sentence, see HRS §§ 604-10.5(h), 706-663 (1993)-- a consequence of greater seriousness than that carried by a civil contempt citation. See Murray v. Murray, 60 Haw. 160, 162, 587 P.2d 1220, 1222 (1978) ("The significant and essential characteristic of a sanction imposed for civil contempt is that the penalty can be avoided by compliance with the court order.").

Thus, a prerequisite to punishing a person for violating an injunction order issued under HRS § 604-10.5 that protects against harassment is a court order that is "clear and unambiguous," LeMay, 92 Hawai'i at 625, 994 P.2d at 557, so as to allow a person of ordinary intelligence to "ascertain from the four corners of the order precisely what acts are forbidden," id. (quoting Dystar Corp. v. Canto, 1 F. Supp. 2d 48, 54 (D. Mass. 1997)) (internal quotation marks omitted). This requirement is no more than a rule of reason because, as it is for statutes, fairness and due process dictate that a court

14

order must be sufficiently particular and definite so as to clearly identify the conduct that it prohibits. See United States v. Twentieth Century Fox Film Corp., 882 F.2d 656, 659 (2d Cir. 1989) (noting that criminal contempt sanctions may be levied only if predicated on a violation of "the specific and definite terms of a court order"); 17 Am. Jur. 2d Contempt § 140 (stating that a court order that could support a contempt sanction is one that describes, in "certain, clear, and definite terms[,] . . . the duties thereby imposed or the actions required or forbidden"); cf. State v. Xiao, 123 Hawai'i 251, 261, 231 P.3d 968, 978 (2010) (Acoba, J., concurring and dissenting) (reasoning that statutes must be construed in a manner as to clearly enunciate "what conduct is prohibited" so that individuals subject to them "may choose between lawful and unlawful conduct").[10]

B.    **The plain meaning of the words "residence" and "yard"**

The phrase "residence, including yard" in the Injunction Order is clear and unambiguous on its face. As such, it leaves no room for interpretation, and its plain language must control. Shade v. Kirk, 420 N.W.2d 284, 286 (Neb. 1988) ("When the language of a . . . decree is plain and unambiguous,

---

[10]    See also In re Doe, 96 Hawai'i 73, 82, 26 P.3d 562, 571 (2001) (stating that before a minor could be held in criminal contempt of court, the "terms and operation" of the underlying court order must be readily understandable to the minor).

there is no room for construction . . . ."); Callan v. Callan,
468 P.2d 456, 458 (Wash. Ct. App. 1970) (accord); 50 C.J.S.
Judgments §§ 744-45 (accord); see Kawamata Farms, Inc. v. United
Agri Products, 86 Hawai'i 214, 259, 948 P.2d 1055, 1100 (1997)
(according "plain meaning" to this court's remand order in
construing its scope).

In effectuating its plain language, the words
"residence, including yard" must "be taken in their ordinary and
familiar signification, and regard is to be had to their general
and popular use."  See In re Taxes of Johnson, 44 Haw. 519, 530,
356 P.2d 1028, 1034 (1960) (quoting Advertiser Publ'g Co. v.
Fase, 43 Haw. 154, 160 (Haw. Terr. 1960)); see Sierra Club v.
Castle & Cooke Homes Haw., Inc., 132 Hawai'i 184, 191—92, 320
P.3d 849, 856—57 (2013) (noting that courts must "give words
their ordinary meaning unless something in the statute requires
a different interpretation" (quoting Saranillo v. Silva, 78
Hawai'i 1, 10, 889 P.2d 685, 695 (1995)) (internal quotation mark
omitted)); see also HRS § 1-14 (2009) ("The words of a law are
generally to be understood in their most known and usual
signification.").[11]

---

[11]    This court explained that looking to the common usage of words
when they are clear and unambiguous reflects

> a rule of common sense, for it must be supposed that
> the legislature, in enacting a statute, intended that
> the words used therein should be understood in the

(continued. . .)

In conducting a plain meaning analysis, "this court may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined."  State v. Pali, 129 Hawai'i 363, 370, 300 P.3d 1022, 1029 (2013) (quoting State v. Kikuta, 125 Hawai'i 78, 96, 253 P.3d 639, 658 (2011)) (internal quotation marks omitted); see Travelocity.com, L.P. v. Dir. of Taxation, 135 Hawai'i 88, 106—07, 346 P.3d 158, 175—76 (2015) (considering dictionary definitions in conducting a plain meaning analysis).

The Oxford Dictionaries defines "residence" as "[a] person's home; the place where someone lives."[12]  "Yard" is defined by the Oxford Dictionaries as "[a] piece of ground

---

(. . .continued)
> sense in which they are ordinarily and popularly understood by the people, for whose guidance and government the law was enacted, unless there is something in the statute showing that the words in question were used in some other sense.

In re Taxes of Johnson, 44 Haw. at 530, 356 P.2d at 1034 (emphasis added) (internal quotation marks omitted).

[12]    Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/residence (last visited Apr. 22, 2015).  In a similar manner, Merriam-Webster Dictionary defines "residence," in relevant part, as "the place where one actually lives as distinguished from one's domicile or a place of temporary sojourn" or "a building used as a home."  Merriam-Webster, http://www.merriam-webster.com/dictionary/residence (last visited Apr. 24, 2015).  Black's Law Dictionary defines "residence" as "[t]he place where one actually lives"; "[a] house or fixed abode; a dwelling."  Black's Law Dictionary 1502 (10th ed. 2014); see Commonwealth v. Ortiz, 738 A.2d 403, 404—05 (Pa. 1999) (quoting Black's Law Dictionary for the definition of residence).

<u>adjoining a building or house</u>" or "[a]n area of ground surrounded by walls or buildings."[13]

Based on its plain and generally known meaning, it is clear that the phrase "residence, including yard," as it is used in the Injunction Order, is the house in which Varel lives and the adjacent area surrounding it.[14]

---

[13]     Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/yard#yard-2 (emphasis added) (last visited April 13, 2015).  Yard may also refer to "[a]n area of land used for a particular purpose or business," e.g., a storage yard or a dump yard.  <u>Id.</u>  This variation of the definition of yard is not applicable in this case.

The Merriam-Webster Dictionary defines yard as "a small usually walled and often paved area open to the sky and adjacent to a building"; "the grounds of a building or group of buildings"; or "the grounds immediately surrounding a house that are usually covered with grass."  Merriam-Webster, http://www.merriam-webster.com/dictionary/yard (last visited Apr. 13, 2015).  At trial, the State defined "yard" for the district court as "the grounds immediately surrounding a house" in accordance with the Merriam-Webster Dictionary.

[14]     This result is the same regardless of whether the word "including" is interpreted as a word of expansion or a word of limitation. <u>See Hawaiian Ass'n of Seventh—Day Adventists</u>, 130 Hawai'i 36, 46, 305 P.3d 452, 462 (2013).  As previous cases from this court have recognized, "including" means either "an enlargement and has the meaning of <u>and</u> or <u>in addition to</u>, or merely specifies a particular thing already included within the general words theretofore used."  <u>Id.</u> (quoting <u>Lealaimatafao v. Woodward—Clyde Consultants</u>, 75 Haw. 544, 556, 867 P.2d 220, 226 (1994)) (internal quotation marks omitted).  If "including" were taken to mean as merely specifying "a particular thing already included within the general words theretofore used," the definition of residence--the house where Varel actually lives--would serve as the outer limit of what "yard" means, which would exclude the outer ridges of Varel's property where Guyton was seen.  On the other hand, if "including," in this context, were taken to mean "and or in addition to," "yard" would be in addition to "residence"; however, the plain meaning of "yard" would nonetheless exclude the outer ridges of Varel's property in which Guyton was present.

Additionally, under the "and or in addition to" definition of "including," "yard and garage" may be illustrative of other places that could be added to "residence."  <u>Id.</u>  This latter interpretation is the most far-reaching and would render the phrase "residence, including yard and garage" ambiguous in that it could encompass unidentified or remote locations on an expansive property.  Faced with ambiguity in such an instance, the phrase

(continued. . .)

18

Accordingly, an interpretation that would place the entire 1,000 acres of Varel's property within the ambit of the phrase "residence, including yard" would run contrary to its "ordinary and familiar signification," and such application is therefore erroneous. In re Taxes of Johnson, 44 Haw. at 530, 356 P.2d at 1034.[15]

## C. The interpretation by the district court of the phrase "residence, including yard" was incorrect.

The district court and the ICA applied a strained and unnatural interpretation to the phrase "residence, including yard" instead of applying its plain meaning. Consequently, the words "residence, including yard" were interpreted to encompass even the ridges located at the outer limits of Varel's 1¼-square-mile property, which could be accessed either by hiking from within the property or by motorcycle through the neighboring property.

Rather than enforcing the clear and unambiguous language of the Injunction Order, the district court's interpretation expanded the meaning of "residence, including yard" well beyond the ordinary and familiar signification of

_____

(. . .continued)
"residence including yard" should be interpreted consistent with the known and usual signification of these terms. See infra Part IV.B

[15]     The State's use of the word "premises" in its complaint against Guyton--a word that does not appear in the Injunction Order, see supra note 4--may be an implicit acknowledgement that the phrase "residence, including yard" does not encompass the area in which Arnold observed Guyton.

these words.[16]  The district court's interpretation deviated from, rather than furthered, the requirement of specificity and clarity in court orders, particularly because the violation involved could carry criminal sanctions.  See LeMay, 92 Hawai'i at 625, 994 P.2d at 557.  Because the phrase "residence, including yard" is clear, the duty of the district court was to enforce, and not to overextend, its plain meaning.  See State v. Palama, 62 Haw. 159, 161—62, 612 P.2d 1168, 1170 (1980) (explaining that "when the language is plain and unmistakable, the court is bound by" it, leaving "no room for judicial construction").

Even if we were to assume that the phrase "residence, including yard" is ambiguous, the district court's interpretation was erroneous under comparable principles of statutory interpretation used in resolving ambiguities within a statute.

The first of such principles states that "[w]here the meaning of a word is unclear in one part of a statute but clear in another part, the clear meaning can be imparted to the unclear usage on the assumption that it means the same thing

---

[16]     The preprinted, standard form used for the Injunction Order provided a space for "[s]pecial conditions or modifications," which would have allowed the district court to indicate that the entire 1,000 acres of Varel's property were intended to be within the scope of the Injunction Order.

throughout the statute." Kam v. Noh, 70 Haw. 321, 325, 770 P.2d 414, 416 (1989). This means that, "[i]n the absence of an express intention to the contrary, words or phrases used in two or more sections of a statute are presumed to be used in the same sense throughout." Id. at 325—26, 770 P.2d at 417 (quoting Gaspro, Ltd. v. Comm'n of Labor & Indus. Relations, 46 Haw. 164, 172, 377 P.2d 932, 936 (1962)) (internal quotation marks omitted).

In this case, paragraph 3(a) of the Injunction Order restrained and enjoined Guyton from contacting, threatening, or physically harassing Varel "and any person(s) residing at [Varel's] residence." (Emphasis added). To reside at one place means "to live in a particular place" or "to exist or be present."[17] The phrase "reside at" contemplates living, existing or being present in a specific and identifiable physical structure, as compared to the phrase "reside in," which is used to refer to a general area or locality within which a person lives.[18] Id.

---

[17] Merriam-Webster, http://www.merriam-webster.com/dictionary/residing (last visited April 13, 2015).

[18] These examples are provided by the Merriam-Webster Dictionary:

He resides in St. Louis.

He still resides at his parents' house.

Merriam-Webster, http://www.merriam-webster.com/dictionary/residing (last visited May 26, 2015) (emphases omitted).

Thus, it is clear from the phrase "person(s) residing at [Varel's] residence" that paragraph 3(a) specifically refers to "residence" as a structure in which one could reside, such that "[Varel's] residence" could only mean the house where Varel actually lives in--and not the entire 1,000 acres of property within which his house is located.  Under the rule elucidated by Kam, therefore, the meaning of "residence," as it is used in the phrase "residence, including yard," in paragraph 3(c) of the Injunction Order is the same as the meaning of "residence" in paragraph 3(a)--the house in which Varel actually lives.  Cf. Kam, 70 Haw. at 325—26, 770 P.2d at 417 (holding that the word "use" has the same meaning throughout the statute).

In addition, "the instant case arises under the penal law, where the basic canons of statutory construction counsel in favor of a less expansive definition" according to the rule of lenity.  State v. Bayly, 118 Hawai'i 1, 15, 185 P.3d 186, 200 (2008).  This longstanding precept of statutory interpretation states that "[w]here a criminal statute is ambiguous . . . the statute must be strictly construed against the government and in favor of the accused."  State v. Shimabukuro, 100 Hawai'i 324, 327, 60 P.3d 274, 277 (2002); see Staples v. United States, 511 U.S. 600, 619 n.17 (1994).  The rule of lenity can be considered as a natural extension of the principle that the language of a court order must be sufficiently particularized, clear, and

unequivocal before its violation could be punished.  See supra Part IV.A.

If the court order is ambiguous and not readily understandable, its language should be construed in favor of the defendant.  See State v. Sakamoto, 101 Hawai'i 409, 413 n.3, 70 P.3d 635, 639 n.3 (2003) (stating that a criminal statute will not be interpreted expansively so as to increase the penalty "when such an interpretation can be based on no more than a guess as to what the legislature intended" (quoting Simpson v. United States, 435 U.S. 6, 15 (1978)) (internal quotation mark omitted) (alteration omitted)).  In NBA Properties, Inc. v. Gold, 895 F.2d 30, 32 (1st Cir. 1990), for example, the court stated that ambiguities or omissions in a court order will be read in favor of the person charged with contempt.  Hence, any ambiguity in the language of the Injunction Order must be resolved in favor of Guyton.  See State v. Woodfall, 120 Hawai'i 387, 396, 206 P.3d 841, 850 (2009) (concluding that an ambiguous statute must be strictly construed against the government and in favor of the accused); State v. Aiwohi, 109 Hawai'i 115, 129, 123 P.3d 1210, 1224 (2005) (accord).

Applying the rule of lenity, the meaning of the phrase "residence, including yard"--construed in favor of Guyton-- should be the same as its plain and popularly understood meaning--i.e., the place in which Varel actually lives and its

23

immediate vicinity, and not inclusive of Varel's entire 1,000-acre property, particularly as to the remote area of the property in which Arnold observed Guyton.  Thus, even if the phrase "residence, including yard" is considered to be ambiguous, the district court's unduly expansive interpretation of the phrase was erroneous in light of the principles embodied by both Kam and the rule of lenity.

**D.    The conviction was not supported by sufficient evidence**

Viewing the evidence in the light most favorable to the State, State v. Kalaola, 124 Hawai'i 43, 49, 237 P.3d 1109, 1115 (2010), and according appropriate deference to the district court's credibility determinations, Monteil, 134 Hawai'i at 368, 341 P.3d at 574, the record demonstrates that Guyton was observed by Arnold on the outer limits of Varel's 1,000-acre property.  This area is outside of the meaning of "residence, including yard," which, interpreted under its plain meaning or under principles of statutory construction, encompasses only the house where Varel lives and the area directly adjacent to it.  See supra Part IV.A-C.  Therefore, the conviction in this case was not supported by sufficient evidence and must be reversed.  State v. Silver, 125 Hawai'i 1, 9, 249 P.3d 1141, 1149 (2011); State v. Bannister, 60 Haw. 658, 660, 594 P.2d 133, 135 (1979).

## V.    CONCLUSION

Accordingly, the ICA Judgment on Appeal and the district court Judgment are reversed.

James S. Tabe                    /s/ Mark E. Recktenwald
for petitioner
                                 /s/ Paula A. Nakayama

                                 /s/ Sabrina S. McKenna

                                 /s/ Richard W. Pollack

                                 /s/ Michael D. Wilson

