**Electronically Filed
Supreme Court
SCWC-14-0000833
29-JUN-2017
09:26 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

KEVIN PAUL KIM,
Petitioner/Defendant-Appellant.

SCWC-14-0000833

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0000833; CR. NO. 12-1-0363)

JUNE 29, 2017

NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ., WITH
RECKTENWALD, C.J., CONCURRING SEPARATELY

OPINION OF THE COURT BY POLLACK, J.

This case concerns a challenge by Kevin Paul Kim regarding the validity of his waiver of the right to testify at trial. Kim also contends that the trial court's warnings to him

during trial intimidated him and influenced his decision not to testify.  We hold that the record does not support a conclusion that Kim's waiver of the right to testify was voluntarily, intelligently, and knowingly made.  Thus, we need not resolve whether the trial court's statements influenced Kim's decision not to testify, but in light of Kim's contention we provide guidance on this issue.

## I. BACKGROUND

### A. General Overview

On March 5, 2012, the State filed a complaint against Kevin Paul Kim in the Circuit Court of the First Circuit (circuit court), alleging the following four counts: count 1, burglary in the first degree, in violation of Hawaii Revised Statutes (HRS) § 708-810(1)(c);[1] count 2, terroristic threatening in the second degree, in violation of HRS § 707-717;[2] count 3, assault in the third degree, in violation of HRS § 707-

---

[1] A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and: . . . [t]he person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

HRS § 708-810(1)(c) (1993).

[2] "A person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707-716."  HRS § 707-717(1) (1993).

712(1)(a);[3] and count 4, criminal property damage in the fourth
degree, in violation of HRS § 708-823.[4]  The allegations in
counts 1, 2, and 3 concerned an interaction between Kim and the
complaining witness on February 23, 2012.  Count 4 involved an
incident alleged to have occurred on February 21, 2012.

A jury trial took place in February 2014, nearly two
years after the occurrence of the incidents in this case.[5]

### B. Advisement at Beginning of Trial

On the first day of trial, the circuit court discussed
the right to testify with Kim.  Kim indicated that he had not
yet made up his mind about whether he wanted to testify:

> THE COURT: Mr. Kim -- our panel is not here -- you
> have a constitutional right, Mr. Kim, to testify in your
> own defense at the trial which we're about to begin.
>
> Now, you should talk with your lawyer and anybody
> else you want to talk with about this decision to testify,
> but this must be your decision.  And if you decide you want
> to testify, nobody can stop you from testifying.  If you
> decide to testify, the prosecution will be given a chance
> to question you.
>
> You also have a constitutional right not to testify
> but rather to remain silent.  Again, talk with whomever you
> wish to talk with, of course including your lawyer, about
> this decision, but this decision must be yours.  And if you

---

[3]     "A person commits the offense of assault in the third degree if
the person: . . . [i]ntentionally, knowingly, or recklessly causes bodily
injury to another person . . . ."  HRS § 707-712(1)(a) (1993).

[4]     "A person commits the offense of criminal property damage in the
fourth degree if by means other than fire, the person intentionally or
knowingly damages the property of another without the other's consent."  HRS
§ 708-823 (1993 & Supp. 2006).

[5]     The Honorable Karen S.S. Ahn presided.

decide you don't want to testify nobody, including your only lawyer, can force you to testify.

If you decide to testify I will instruct the jury that it cannot hold your silence against you when it decides your case. Whatever your decision is by the end of trial I am going to briefly question you and the only objective is to make sure that you understand all of these rights and that your decision, whatever it is, was your decision, okay, you understand?

THE DEFENDANT: Kind of, yeah.

THE COURT: Well, do you have any questions?

THE DEFENDANT: No, not really. I haven't made my mind up yet.

THE COURT: That's fine. And well if you have any questions, now is the time to ask because it's very important that you understand these two rights that nobody can force you to do what you don't want to do. And that if you decide to testify, the prosecution will be given a chance to question you. And if you don't testify, you decide you don't want to testify, I'm going to instruct the jury that it cannot hold your silence against you because that is your right, okay?

THE DEFENDANT: Yes.

THE COURT: So I want you to understand all of this. Do you have any questions about anything?

THE DEFENDANT: Oh, I've got tons of questions.

[DEFENSE COUNSEL]: I'll address them, Your Honor.

THE COURT: Okay. Do you have any questions about what you and I have just talked about?

THE DEFENDANT: No, Your Honor.

THE COURT: Okay. Do you understand what you and I have talked about?

THE DEFENDANT: Yes.

The State's evidence consisted of testimony from three investigating Honolulu Police Officers; testimony of the complaining witness, Daniel Lewis; and photographs of Lewis's

home and his injuries after the incident. Lewis testified at trial that he was friends with Kim and Kim's former girlfriend, Jennifer Jimenez. At the time of the two incidents, Jimenez was living with Lewis at his home because Kim had broken up with Jimenez two weeks earlier. Lewis testified that, late in the evening on February 21, 2012, the tires of his vehicle had been cut "on [the] sidewalls so they couldn't be repaired." From his bedroom window, Lewis saw Kim bend down near his car tires and then walk around to the other side of the car.

Most of Lewis's testimony, however, was regarding the incident on the morning of February 23, 2012. Lewis testified that Kim came to his home and first attempted to force his entry through the back door, which is a sliding glass door that was partially open but secured by a wooden dowel. According to Lewis, Kim stuck his arm through the door and made "glancing blows" to his shoulder and head, preventing him from closing the door. Lewis testified that he then instructed Kim to go to the front door where he opened the door to let Kim enter to stop Kim from damaging the structure. Lewis had not told the police that he had allowed Kim to enter through the front door.

Lewis testified that, when he opened the door to Kim, Kim attacked him with a large stick, jabbing him in his midsection, and knocking him off his feet. According to Lewis,

5

he attempted to prevent Kim from hitting him by holding on to the stick and that Kim also punched and kicked him.  Lewis explained that Jimenez eventually physically broke them up by grabbing hold of Kim and guiding him toward the driveway to leave.  Lewis testified that he and Kim were yelling obscenities at each other, he then verbally challenged Kim, and Kim attacked Lewis again.  Jimenez again broke them up, and Jimenez and Kim proceeded to leave.

Lewis acknowledged that he was under probationary supervision, and he also referenced his intimate relationship with Jimenez and indicated that, at the time of the incident, he wanted Jimenez to be his girlfriend.  Lewis stated that he attempted to and desired to withdraw his complaint before the trial.

An investigating officer testified that she attempted to contact Jimenez, who was present when the incident occurred on February 23, 2012.  However, the officer did not make contact with Jimenez and was unable to get a statement from her.  The officer who responded to Lewis's call to the police testified that he believed he questioned Lewis's neighbors.  But, he was unable to locate a witness on the cul-de-sac where Lewis's home is located who had seen or heard screaming or banging on a side of a house.

### C. Warning to Kim After Jury Selection

Following jury selection on the first day of trial, the circuit court warned Kim to "use a poker face" and to not smile and shake his head at certain questions:

> THE COURT: Counsel and defendant are present, our jury has left the courtroom.
>
> Mr. Kim, you need to use a poker face.  No clapping at the end of the selection of the jury.
>
> THE DEFENDANT: It's very emotional.  I understand.
>
> THE COURT: No smiling and shaking your head at certain questions.  I mean, you know, the jury is watching you.  And you may think that this is a positive thing for you.  But you don't know, they may be looking at it and thinking -- coming to negative conclusions and you don't want that, okay.  So I'm going to require that everybody use a poker face, that's real important in these cases. And what happens at counsel table is not evidence, all right?

### D. Warning to Kim During Cross-Examination of Lewis

The following day, during cross-examination of Lewis, defense counsel sought to impeach Lewis with a prior inconsistent statement regarding Kim's purpose in coming to Lewis's home on February 23, 2012.  Previously, Lewis told an investigating officer that he felt threatened by Kim and that Kim was attempting to enter the house to "get at" Jimenez. Lewis testified at trial, however, that he initially did not think that Kim would attack him and that Kim did not mean to harm Jimenez but only to "retrieve her."  During this line of questioning, the court asked both counsel to approach the bench;

7

defense counsel was instructed to tell Kim to "stop making faces":

> THE COURT: You're going to have to tell your client to stop making faces.  He's doing things like that where I'm going to – I'm going to say something in front of the jury.
>
> . . .
>
> [DEFENSE COUNSEL]: He's a very emotional man.
>
> THE COURT: There's something wrong with him.
>
> [DEFENSE COUNSEL]: He's upset.
>
> THE COURT: No, people are upset, but they, you know, they don't do this.  You tell him I'm going to tell him as soon as the jury leaves if he does that again I'm going to say it in front of the jury.

Defense counsel continued questioning Lewis regarding the incident and asked Lewis whether he had mentioned earlier in his testimony that Kim made a fist with the hand that he stuck through the door; Lewis confirmed that was his testimony. Defense counsel then proceeded to question Lewis regarding a preexisting injury that caused the index fingers on Kim's hands to be different in size.  After the prosecution made an objection, the court excused Lewis and the jury, and the court immediately spoke to Kim regarding his behavior.

> THE COURT: . . .
>
> Mr. Kim.
>
> . . .
>
> THE COURT: You can not [sic] be making faces in front of the jury, shaking your head or something.  That is

8

inappropriate.  Defendants do not act that way, most of them know better and I warned you yesterday.

THE DEFENDANT: Yes.

THE COURT: You're doing it again today.  After I -- some part of the testimony by Mr. Lewis you said you put up your fingers and tried to get your lawyer's attention.

THE DEFENDANT: Yes, ma'am, I did that.

THE COURT: I think what you may have been trying to imply is that it's so wrong I need to tell [Defense Counsel].

THE DEFENDANT: Yes, that's it.  I don't know.

. . .

THE COURT: But you can not [sic] be trying to communicate to the jury that this is all ridiculous.  As they were filing out you were holding your two hands palm down so that the jury could see them and I will not tolerate that.

THE DEFENDANT: Okay.

THE COURT: What is wrong?

THE DEFENDANT: Nothing is wrong.

THE COURT: It strikes me that something is wrong because you can't follow instructions.

THE DEFENDANT: Your Honor, I'm not trying to disrespect you at all.

THE COURT: We're trying to get a fair trial here.  I don't know what happened, it's up to the jury to decide.

THE DEFENDANT: Right.

THE COURT: But your play acting I think is what I would really call it over there at counsel's table is totally inappropriate.  And you may think not so that you want to be acquitted, fine, I don't blame you, but you cannot do this.  You have to – there's the proper administration of justice, we're doing a trial, it's up to the jury to decide on the evidence, not on the shaking of your head over there, you're holding up your two hands so they can see it as they file out.  That is, I mean, I think I am very close to I think being able to eject you from this courtroom.

THE DEFENDANT: It's very hard to be here, Your Honor. I am very excited when he says something that's genuine.

THE COURT: Well, genuine from your point of view?

THE DEFENDANT: Yes.

THE COURT: You're the one who's on probation. You're the one accused of this crime. You're the one looking at five years in jail.

THE DEFENDANT: Yes, ma'am.

THE COURT: I would just be quiet and let the jury decide.

THE DEFENDANT: Yes, ma'am.

. . .

THE COURT: We're going to try this case fairly.

THE DEFENDANT: Thank you.

THE COURT: With or without you.

THE DEFENDANT: Yes, ma'am, I'm all about fairness, ma'am, Your Honor.

THE COURT: That's hard to believe watching your antics.

THE DEFENDANT: I'm not trying to sway them or act, it's all genuine.

THE COURT: Why would anyone hold up their hands if so they could see this?

THE DEFENDANT: No, I don't know.

THE COURT: Oh, no, Mr. Kim, don't lie to me, I was watching you. You were standing at the edge of the table facing the filing jurors and you were holding your hands out in front of your stomach in the air with palms down, fingers out, I saw that. Do not try to tell me your hands were on the table, that's a lie.

THE DEFENDANT: Yes, ma'am, it's close to the table.

THE COURT: They were not close to the table, they were in the air?

THE DEFENDANT: Yes, yes.

10

THE COURT: Do not lie to me, Mr. Kim, that would be very silly.

THE DEFENDANT: That's it, last thing I want to do is lie.

THE COURT: That wouldn't be smart at all, right, okay?

THE DEFENDANT: Yes, Judge.

THE COURT: Please use your brains.

THE DEFENDANT: Yes, ma'am, yes, ma'am.

THE COURT: I think your [sic] being obstructive.

THE DEFENDANT: I'm trying my best, I'll do better.

THE COURT: Well --

THE DEFENDANT: This is really important to me.

THE COURT: It's important for a lot of reasons, and your [sic] one of them. And we're trying to get you a fair trial. We're trying to give the State a fair trial. We're trying to let the jury decide appropriately on the evidence that they believe, whatever that is, all right.

The prosecution placed its objection on the record, stating that Kim had put his index fingers out side-by-side as a way of demonstrating to Lewis and any other potential onlookers--including the jury--that his right index finger is shorter than his left index finger. Defense counsel then informed the court that, at a later point, he was going to request permission for Kim to show his fingers to the jury. The court indicated that it did not think that would be a problem, but stated that Kim "can't do that as he's sitting there." The exchange continued as follows:

[DEFENSE COUNSEL]: Just so Mr. Kim is clear, if there's any further shaking of the heads, the Court is going to admonish him in front of the jury.

THE COURT: I'm considering that. I'm also considering ejecting him out.

THE DEFENDANT: And the trial continues without me?

THE COURT: Yes.

[DEFENSE COUNSEL]: We would.

THE COURT: I don't want to do that, that's the last resort, but the law says you can if somebody is just being obstructive. Okay, are we clear?

THE DEFENDANT: Yeah, we're clear.

THE COURT: All right, you have any questions?

. . .

[DEFENSE COUNSEL]: This is the first time he's been in trial. I instructed him about procedures and again it's an emotional time for him, it's been two years and he has --

. . .

THE COURT: I don't want to hear anything more about the emotion, all right. You're a grown man, I would think you're able to control your emotions or something, I would assume that. You could talk to your lawyer all you want. You can take notes. I'll give you all the time to talk to him that you need. But there will be no more smiling, shaking one's head, kind of rolling one's eyes, holding up fingers, holding up hands to show the jury, that's incredibly -- well, it's really inappropriate.

THE DEFENDANT: I'm sorry. I didn't realize.

### E. <u>Tachibana</u> Colloquy

After the State rested its case, Kim was permitted to approach the jury box.[6] Kim showed the jury his hands facing down; he also pointed his right index finger and his left index finger for the jury to compare. Further, Kim held out his hands with his palms facing up, and he made two fists for the jury to see. Following this demonstration, there was a lunch recess.

After the lunch recess, the court asked defense counsel whether Mr. Kim had made a decision with respect to testifying:

> THE COURT: Okay, let's go back on the record. Counsel and the defendant are present, but not our jury.
>
> [Defense counsel], has your client made a decision?
>
> [DEFENSE COUNSEL]: Yes, Your Honor. I've reviewed with Mr. Kim the pros and cons of testifying, and he is electing not to testify and it's his decision.
>
> BY THE COURT:
>
> Q.   Okay. Mr. Kim, as you and I talked about at start of the trial, you have a constitutional right to testify in your own defense. And you should talk with your lawyer and anybody else you may want to talk with, but the decision to testify is yours and yours alone. And if you decide you want to testify, nobody can stop you from testifying, including your own lawyer. If you decide to testify, the prosecution will be given a chance to question you.
>
>      You also have a constitutional right not to testify. You have a right to remain silent. Again, talk

---

[6]   The apparent purpose of Kim's presentation of his hands to the jury was to impeach Lewis's testimony that Kim made a fist with his hands. Defense counsel later argued in closing argument that a preexisting injury to Kim's right index finger prevented him from bending it to form a fist.

> with whomever you want to talk with, but this decision must be yours and yours alone. If you decide you don't want to testify, nobody can force you to testify. If you decide not to testify, I instruct the jury that it cannot hold your silence against you in deciding your case. Have you understood all of that?
>
> A. Yes, ma'am.
>
> Q. Okay. Any questions about anything related to that or anything else?
>
> A. I think I'm finally starting to get it here.
>
> Q. Okay. So do you have any questions?
>
> A. Not really.
>
> Q. All right. And what is your decision as to whether you want to testify or not which is your decision alone?
>
> A. Well, in your words I want to but I can't, I don't think I can, so I'm not going to.
>
> Q. Well, you know, as I say, it's your decision, it's your case, and it's you who has to make the decision.
>
> A. I choose not to.
>
> THE COURT: Okay. I think from what I've seen and heard, Mr. Kim, he looks very cognizant and alert and I believe he understands his right to testify and his right not to testify and that this is his decision, and he's voluntarily, knowingly and intelligently decided to give up that right.

The defense then rested without presenting any testimonial evidence.

The jury found Kim guilty of criminal trespassing in the first degree, terroristic threatening in the second degree, and assault in the third degree. By special interrogatory, the jury indicated that the prosecution proved beyond a reasonable doubt that the fight or scuffle was not entered into by mutual

consent.  And, with regard to count 4, criminal property damage in the fourth degree, the jury found that Kim was not guilty. Kim was sentenced to one year in jail for each conviction, with the terms to run concurrently.  Kim appealed to the Intermediate Court of Appeals (ICA) from the Judgment of Conviction and Sentence entered by the circuit court on April 30, 2014.

## II. ICA PROCEEDINGS

In his opening brief, Kim argued that the circuit court influenced his decision not to testify by intimidating him throughout the entire trial.  Kim contended that the circuit court threatened to admonish him in front of the jury and to eject him from the courtroom; he asserted it "seemed apparent" that he "wanted to be heard and testify," but that the circuit court "swayed" him from testifying.

Kim also argued that the circuit court did not engage in a true colloquy with him to ascertain his understanding of his Tachibana rights and that this failure resulted in "a failure to obtain the on-the-record waiver required by Tachibana."  Kim noted that the circuit court did not advise or assure him of his right to testify during the exchange in which the circuit court admonished him for making faces and trying to communicate to the jury.  Kim asserted that it is unknowable

15

whether his testimony could have established reasonable doubt that he committed the charged offenses.

In its answering brief, the State asserted that the circuit court conducted the required Tachibana colloquy and pre-trial advisement. The State contended that the circuit court addressed Kim's right to testify and not to testify and explained what those rights entailed and what they meant. The State also noted that, although Kim was provided an opportunity to ask questions, he did not have any questions for the court. The State argued that Kim overlooks that assessing whether he knowingly, intelligently, and voluntarily waived his right to testify requires looking at the totality of the facts and circumstances of the particular case. The State maintained that nothing in the record showed that Kim did not understand his rights as explained to him by the court. And, the State further noted that, on appellate review, the circuit court's assessment of the situation and the capabilities of the defendant have to be given some weight.

Additionally, the State argued that, even assuming the court's colloquy was deficient, the error was harmless because Kim presented no evidence at trial, so there was no contradictory evidence to the State's case. The State further contended that while Lewis was extensively cross-examined and

there may have been inconsistencies, the inconsistencies were not so material such that they took away from the essential nature of Kim's conduct.

With regard to Kim's assertion that the circuit court intimidated him, the State noted that Kim did not specify how the court influenced his decision not to testify. The State argued that there was nothing improper about the court warning Kim that he could lose his right to be present at trial if he continued his disruptive behavior.

In a summary disposition order, the ICA concluded that the circuit court adequately advised Kim of his rights and obtained a valid waiver of his right to testify. The ICA reasoned that the circuit court fully advised Kim of the five rights required by the Tachibana colloquy. The ICA noted that, after engaging in a discussion with Kim, the circuit court clearly stated that Kim looked "very cognizant and alert" and that he understood the Tachibana colloquy and its implications.

With regard to Kim's argument that the circuit court intimidated him throughout trial, thus influencing his decision not to testify, the ICA concluded that the record was insufficient to support a determination that the circuit court's warnings were "sufficiently intimidating" as to affect Kim's decision not to testify. The ICA reasoned that a trial court is

well within its discretion to warn a defendant that he or she could lose the right to be present at trial, if the defendant's disruptive behavior persists after the warning.

## III. STANDARD OF REVIEW

The validity of a criminal defendant's waiver of the right to testify is a question of constitutional law reviewed by this court under the right/wrong standard. See State v. Gomez-Lobato, 130 Hawai'i 465, 468-69, 312 P.3d 897, 900-01 (2013) ("The validity of a criminal defendant's waiver of his or her right to a jury trial presents a question of state and federal constitutional law. . . . [W]e review questions of constitutional law under the right/wrong standard.").

## IV. DISCUSSION

Hawai'i law has historically protected both the right to testify and the right not to testify. State v. Monteil, 134 Hawai'i 361, 369, 341 P.3d 567, 575 (2014). The right to testify is guaranteed by the Fifth and Sixth Amendments to the United States Constitution; article I, sections 5, 10, and 14 of the Hawai'i Constitution; and HRS § 801-2 (1993). State v. Pomroy, 132 Hawai'i 85, 91, 319 P.3d 1093, 1099 (2014). The right not to testify is guaranteed by the Fifth Amendment and the Hawai'i

18

Constitution's parallel guarantee under article I, section 10. Monteil, 134 Hawai'i at 369, 341 P.3d at 575.

In Tachibana v. State, this court held that, "in order to protect the right to testify under the Hawai'i Constitution, trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify." 79 Hawai'i 226, 236, 900 P.2d 1293, 1303 (1995). "In addition to requiring an 'ultimate colloquy,' Tachibana strongly recommended trial courts conduct a prior-to-trial advisement to inform defendants of their right to testify and the right not to testify." Monteil, 134 Hawai'i at 370, 341 P.3d at 576 (quoting Tachibana, 79 Hawai'i at 237 n.9, 900 P.2d at 1304 n.9). Thus, trial courts are charged with a "'serious and weighty responsibility'" of ensuring that the waiver of the right to testify is a knowing and intelligent decision, id. at 371, 341 P.3d at 577 (quoting Tachibana, 79 Hawai'i at 233, 900 P.2d at 1300), and it is the trial court's duty to establish a record sufficient to "effectively settle the right-to-testify issues in the case." Pomroy, 132 Hawai'i at 93 n.7, 319 P.3d at 1101 n.7 (citing State v. Han, 130 Hawai'i 83, 91, 306 P.3d 128, 136 (2013)).

## A. The Record Is Insufficient For Appellate Determination That The Waiver Was Valid.

This court has emphasized the importance of engaging in a "true colloquy" with the defendant, one that consists of an "'oral exchange' in which the judge ascertains the defendant's understanding of the proceedings and of the defendant's rights." Pomroy, 132 Hawai'i at 93, 319 P.3d at 1101 (quoting Han, 130 Hawai'i at 90, 306 P.3d at 135). "The failure to engage in a true exchange to ascertain the defendant's understanding of the individual rights comprising the Tachibana colloquy results in the failure to ensure that [the defendant] understood his [or her] rights [and] amounts to a failure to obtain the on-the-record waiver required by Tachibana." Id., 319 P.3d at 1101 (first and third alterations in original) (quoting Han, 130 Hawai'i at 91, 306 P.3d at 136).

In this case, the record is insufficient to support a determination that Kim's waiver of his right to testify was voluntarily, intelligently, and knowingly made. Although the circuit court advised Kim of his right to testify or not to testify, the court did not engage in the requisite exchange to ascertain Kim's understanding of his rights. After advising Kim of his rights to testify and not to testify, the court asked Kim his decision regarding testifying, and Kim responded in a manner

that indicated that he did not adequately understand his

constitutional rights:

> Q. All right. And what is your decision as to whether you want to testify or not which is your decision alone?
>
> A. <u>Well, in your words I want to but I can't, I don't think I can, so I'm not going to.</u>
>
> Q. Well, you know, as I say, it's your decision, it's your case, and it's you who has to make the decision.
>
> A. I choose not to.
>
> THE COURT: Okay. I think from what I've seen and heard, Mr. Kim, he looks very cognizant and alert and I believe he understands his right to testify and his right not to testify and that this is his decision, and he's voluntarily, knowingly and intelligently decided to give up that right.

(Emphasis added.) When Kim stated, "in your words I want to but

I can't, I don't think I can, so I'm not going to," it raised

serious questions as to whether Kim truly understood his right

to testify or not to testify. It was incumbent on the circuit

court at this point to question Kim further: (1) to determine

why Kim believed he could not testify, even though he indicated

that he wanted to testify; (2) to clarify any misunderstanding

that Kim had regarding his trial rights; and (3) to establish a

record demonstrating Kim's understanding of his right to testify

following the court's clarification. The court's response,

"it's your decision, it's your case, and it's you who has to

make the decision," did not address what Kim had said. Although

Kim indicated that he was electing not to testify because he did

not think he could, the court merely repeated what it had earlier stated--that it was Kim's decision whether to testify.

Consequently, the record is silent as to why Kim believed that he could not testify despite his apparent willingness to do so. Because the court only reiterated that it was Kim's decision whether to testify, and Kim responded, "I choose not to," his choice may very well have been influenced or dictated by his belief that he could not testify based on his understanding that he did not think he could. Finally, Kim explained that he had come to his belief that he could not testify as a result of statements the court made; Kim stated, "[I]n your words I want to but I can't." Again, the record lacks any inquiry by the court as to what were the court's words to which Kim was referring, what led to Kim's confusion, and what needed to be explained to him in order to address his confusion.

The circuit court's description of its own assessment of Kim as "cognizant and alert" is not dispositive. "We are tasked with scrutinizing the language used by both the court and the defendant to assess whether a defendant knowingly, intelligently, and voluntarily waived his or her right to testify." Pomroy, 132 Hawai'i at 93 n.7, 319 P.3d at 1101 n.7. While the circuit court's observation of Kim may be helpful on

22

review, we cannot defer to the circuit court's "assessment of [Kim's] understanding whenever the express language on the record leaves us with any doubt about the validity of the colloquy and/or [Kim's] waiver." Id., 319 P.3d at 1101 n.7. Here, Kim's response to the court that he was choosing not to testify based upon his reliance on the circuit court's earlier statements raises serious concerns as to the extent to which Kim understood the right to testify.[7] Therefore, without further questioning by the circuit court, the record is insufficient to support a determination that Kim's waiver of the right to testify was knowingly, intelligently, and voluntarily made.

---

[7] The exchange between the court and Kim regarding his behavior during the trial suggests that circumstances existed that required the court to use extra care in ensuring that Kim understood his rights. It is noted that in circumstances where the court has reason to question the defendant's understanding, it may be necessary for a trial court to ask additional follow-up questions to confirm the defendant's understanding. See State v. Phua, 135 Hawai'i 504, 514, 353 P.3d 1046, 1056 (2015) (providing that additional questioning may be necessary to confirm a defendant's understanding of the court's warnings of the risks of waiving counsel and the disadvantages of self-representation). For example, circumstances requiring additional questioning may exist where there is a language barrier between the defendant and the court. See State v. Krstoth, 138 Hawai'i 268, 276, 378 P.3d 984, 992 (2016) (noting that a language barrier may be a salient fact that puts a court on notice that waiver by the defendant may be less than knowing and intelligent); State v. Gomez-Lobato, 130 Hawai'i 465, 472, 312 P.3d 897, 904 (2013) (concluding that in light of the language barrier between the defendant and court, the defendant's affirmative answers to the judge's questions did not establish that he understood he was waiving his right to a jury trial); Phua, 135 Hawai'i at 514-15, 353 P.3d at 1056-57 (same). In this case, the circuit court specifically stated to defense counsel regarding Kim, "There's something wrong with him."

## B. Whether The Circuit Court Intimidated Kim Need Not Be Determined By This Court.

Kim also contends that the trial court intimidated him into not testifying.  Because we conclude that the record is insufficient to support a determination that Kim's right to testify was knowingly, intelligently, and voluntarily waived, it is not necessary to resolve whether the trial court influenced Kim's decision not to testify.  However, given the exchange that took place between Kim and the circuit court, we provide guidance on this matter.

The United States Supreme Court has declared, "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country."  Illinois v. Allen, 397 U.S. 337, 343 (1970); State v. Castro, 69 Haw. 633, 650, 756 P.2d 1033, 1045 (1988).  Thus, a judge should use the powers of the court to maintain order in judicial proceedings to prevent distractions and disruptions in a trial.[8]

In conducting judicial proceedings, trial judges may be confronted with "disruptive, contumacious, [and] stubbornly

---

[8]    "A trial judge should maintain order and decorum in judicial proceedings.  The trial judge has the obligation to use his or her judicial power to prevent distractions from and disruptions of the trial."  Standards for Criminal Justice: Special Functions of the Trial Judge § 6-3.5(a) (Am. Bar Ass'n 2000).

defiant defendants." Castro, 69 Haw. at 650, 756 P.2d at 1045 (alteration in original) (quoting Allen, 397 U.S. at 343). Under such circumstances, we have stated that trial judges are vested with "sufficient discretion to meet the circumstances of each case." Id., 756 P.2d at 1045 (quoting Allen, 397 U.S. at 343). A trial judge may remove a "particularly obstreperous and disruptive defendant" from the courtroom where the defendant's behavior is of "'an extreme and aggravated nature'" to justify removal. Id., 756 P.2d at 1045 (quoting Allen, 397 U.S. at 343-44, 346); see also Standards for Criminal Justice: Special Functions of the Trial Judge § 6-3.8 (Am. Bar Ass'n 2000) [hereinafter ABA Standards for Trial Judges] ("A defendant may be removed from the courtroom during trial when the defendant's conduct is so disruptive that the trial cannot proceed in an orderly manner.").

At the same time, a "trial judge has the responsibility for safeguarding . . . the rights of the accused." ABA Standards for Trial Judges § 6-1.1(a). Trial judges "should remain sensitive to the various . . . interests . . . involved in the criminal justice system," and "[o]f utmost importance, . . . are the constitutional rights of the defendant." ABA Standards for Trial Judges § 6-1.1(c) cmt. at 17. At times, the duties of protecting the constitutional

rights of the defendant and maintaining the order and decorum of the proceedings may be in tension.  In such circumstances, the court must be cautious in exercising its authority to maintain order and decorum, and the action taken by the court should be proportional to the perceived disruption.  See Allen, 397 U.S. at 343 ("No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations.").

In this case, the court informed Kim in three instances that it was considering removing him from the courtroom.  Certainly, Kim's actions of apparently trying to communicate to the jury from counsel table that his right hand could not form a fist and trying to convey his thoughts through facial expressions provided the basis for intervention by the court.  However, the warning to Kim that the court was very close to ejecting him from the courtroom appears to have been premature.  "Public confidence in the trial process requires that removal of a defendant be limited to cases urgently demanding that action be taken[.] . . ."  ABA Standards for Trial Judges § 6-3.8 cmt. at 66.  A defendant charged with a criminal offense has a right to be present at "each critical stage of the criminal proceeding."  Onaka v. Onaka, 112 Hawai'i 374, 380, 146 P.3d 89, 95 (2006) (citing Rushen v. Spain, 464 U.S. 114, 117 (1983)).  This right is "of no less than

26

constitutional magnitude, and is founded upon the Confrontation and Due Process clauses of both the United States and Hawai'i Constitutions."  State v. Walsh, 125 Hawai'i 271, 285, 260 P.3d 350, 364 (2011) (quoting State v. Okumura, 58 Haw. 425, 427, 570 P.2d 848, 851 (1977)).  The right of presence is "scarcely less important . . . than the right of trial itself."  State v. Kaulia, 128 Hawai'i 479, 492, 291 P.3d 377, 390 (2013) (quoting Diaz v. United States, 223 U.S. 442, 455 (1912)).

On the present record, Kim's behavior had not risen to "'an extreme and aggravated'" level such that his trial could not be carried on with him present.[9]  Castro, 69 Haw. at 650, 756 P.2d at 1045 (quoting Allen, 397 U.S. at 346).  While a court does not have to wait for conduct to reach an egregious nature before issuing a warning, the stated consequences of improper behavior should be proportional to the defendant's conduct.  See id. at 650-53, 756 P.2d at 1045-47; see also ABA Standards for Trial Judges § 6-3.5 cmt. at 57 ("Normally, the judge should use the least severe measures available to maintain order and

---

[9]     "[A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom."  Allen, 397 U.S. at 343.

27

decorum in the courtroom."). A court should be cognizant that overstating the sanction for the behavior involved may risk influencing the defendant's exercise of his or her constitutional trial rights.[10] See ABA Standards for Trial Judges § 6-1.4 cmt. at 22 ("The judge should remain aware that he or she is constantly being observed, and must always be attentive to the proceedings and to the appearance of his or her own actions.").

Additionally, the circuit court advised defense counsel at the bench that, if Kim did not stop making faces, he would be reprimanded in front of the jury, and defense counsel repeated the court's caveat in Kim's presence.[11] While the circuit court sought to preserve the dignity of the proceedings and ensure that both sides received a fair trial, the court's indication that it would reprimand Kim or consider reprimanding Kim in the presence of the jury is generally disfavored. If it is necessary for a judge to comment upon the conduct of the

_____

[10] This may be particularly true when the circumstances indicate that the defendant may be more vulnerable to influence by the court or the defendant lacks experience with the requirements of a court proceeding.

[11] This warning to admonish Kim in front of the jury did not concern instructing the jury to disregard the conduct of Kim that the court considered inappropriate. Immediately after completing its warning to Kim, the court reconvened the jury and instructed the jury that it may only consider the sworn testimony of witnesses and any exhibits that were in evidence.

defendant or others, "the judge should do so outside the presence of the jury, if possible." ABA Standards for Trial Judges § 6-3.5. In addition, Standard 6-3.5 of the Standards for Criminal Justice: Special Functions of the Trial Judge provides that, in commenting upon the conduct of trial participants, the court should "limit[] comments and rulings to what is reasonably required for the orderly progress of the trial." Id.; see also People v. Johnson, 993 N.E.2d 1, 24 (Ill. App. Ct. 2012) (quoting People v. Eckert, 551 N.E.2d 820, 825 (Ill. App. Ct. 1990)) (noting that the trial judge's comments toward defense witness and defense counsel outside the presence of the jury were not "reasonably required for the underlying progress of the trial").

As we noted recently, "[a] judge should be courteous, respectful and civil to lawyers, parties, . . . and all other participants in the legal process." State v. Barrios, 139 Hawai'i 321, 339 n.12, 389 P.3d 916, 934 n.12 (2016) (alteration in original) (quoting Principles of Professionalism for Hawai'i Judges Principle 1).[12] "The conduct of the judge sets the tone

---

[12] See also Hawai'i Revised Code of Judicial Conduct Rule 2.8(b) (2009) ("A judge shall be patient, . . . and courteous to litigants, . . . and others with whom the judge deals in an official capacity . . . ."); ABA Standards for Trial Judges § 6-3.4 cmt. at 55 (stating that the judge "has

(continued . . .)

of the proceedings."  ABA Standards for Trial Judges § 6-3.4

cmt. at 55.  Hence, the judge may have to exercise "extreme

forbearance" and "self-control," particularly in criminal cases,

where proceedings are often stressful.  Id.  In that sense, a

judge should not become involved in a personal conflict with

anyone in the courtroom,[13] as it "tends . . . to undermine

judicial authority."  ABA Standards for Trial Judges § 6-3.4.

The need for judicial restraint in the exercise of

judicial power is heightened by the possibility that the court's

words or conduct may be misunderstood by a party in the

proceeding.[14]  A judge should "be particularly careful by his or

her demeanor not to convey unintended messages . . . to the

participants in the trial process."  ABA Standards for Trial

Judges § 6-1.4 cmt. at 22.  For example, with regard to the

right to testify, there may be circumstances where, in light of

_____

(. . . continued)

the obligation to be patient with and courteous to all participants in the
process").

[13]     In this case, the circuit court repeatedly told Kim not to lie;
asked Kim to be smart; reminded Kim that he was on probation, that he was the
accused, and that he was the one looking at imprisonment; and stated that it
did not want to hear any further statements about emotion, since Kim is a
grown man and thus should be able to control such emotion.

[14]     Kim may have misunderstood some of the court's statements.  In
response to the court's question of whether Kim wanted to testify, Kim
stated, "Well, in your words I want to but I can't, I don't think I can, so
I'm not going to."

the interactions between the court and the defendant during trial, the voluntariness of the defendant's waiver may be implicated. See Tachibana, 79 Hawai'i at 236 n.7, 900 P.2d at 1303 n.7 (noting that, "[i]n conducting the colloquy, the trial court must be careful not to influence the defendant's decision whether or not to testify"). Consequently, in the interests of the proper administration of criminal justice, a court should exercise its authority in a restrained and dignified manner while, at the same time, preserving order and decorum in judicial proceedings. ABA Standards for Trial Judges § 6-3.5; Johnson, 993 N.E.2d at 24.

## V. CONCLUSION

The record in this case is insufficient to support a determination that Kim's waiver of the right to testify was knowingly, intelligently, and voluntarily made. Kim's response to the circuit court during the ultimate Tachibana colloquy indicated that he did not understand his right to testify, and the court did not engage in an exchange that adequately established, on the record, Kim's understanding of that right. This error was not harmless beyond a reasonable doubt,[15] given

---

[15] "Once a violation of the constitutional right to testify is established, the conviction must be vacated unless the State can prove that the violation was harmless beyond a reasonable doubt." Han, 130 Hawai'i at

(continued . . .)

that Lewis's testimony was not entirely consistent and was not corroborated.

Accordingly, the ICA Judgment on Appeal and the circuit court Judgment of Conviction and Sentence are vacated, and the case is remanded to the circuit court for further proceedings.

Tae W. Kim
for petitioner

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack



/s/ Michael D. Wilson



(. . . continued)

93, 306 P.3d at 138 (quoting <u>Tachibana</u>, 79 Hawai'i at 240, 900 P.2d at 1307). Under the harmless beyond a reasonable doubt standard, "[t]he relevant question . . . is whether there is a <u>reasonable possibility</u> that error *might have* contributed to [the] conviction." <u>Id.</u>, 306 P.3d at 138 (quoting <u>State v. Schnabel</u>, 127 Hawai'i 432, 450, 279 P.3d 1237, 1255 (2012)).